Bernard **WEINBERGER**,
Plaintiff,

v.

NEW YORK STOCK EXCHANGE by
Robert W. Haack, President,
Defendant.

No. 69 Civ. 4461.

United States District Court,
S. D. New York.

Nov. 6, 1975.

---

Poletti, Freidin, Prashker, Feldman & Gartner, New York City, for plaintiff; Justin N. Feldman, George J. Solomon, Paul R. Grand, Barbara A. Lee, Kim Ebb, Sharon D. Spring, New York City, of counsel.

Milbank, Tweed, Hadley &. McCloy, New York City, for defendant New York Stock Exchange, Inc.; Andrew J. Connick, Norman R. Nelson, New York City, of counsel.

## OPINION

BONSAL, District Judge.

Plaintiff, Bernard Weinberger, a former limited partner in the now defunct

brokerage firm of Ira Haupt & Co. ("Haupt"), commenced this action against defendant, New York Stock Exchange ("Exchange"), on October 9, 1969. An amended complaint was filed on January 22, 1970. Issue was joined and the case was submitted to the Court for decision on a stipulated record in lieu of trial. Thereafter, the parties filed "post-trial" memoranda and proposed findings of fact and conclusions of law. Oral argument was heard on June 2, 1975.

Plaintiff, a retired clothing store owner, learned of an opportunity to become a limited partner in Haupt through discussions in May or June 1963 with his friend, Sam Teiger. Sam's son, David, was a general partner in Haupt and related by marriage to Haupt's senior partner, Ira Haupt. Shortly thereafter, plaintiff met with David Teiger at Haupt's offices to discuss becoming a limited partner in Haupt. Plaintiff indicated to David that he could invest $250,000 and was informed that for his investment he would receive from Haupt interest at the rate of 6 percent and a share of the profits.

During this visit to Haupt's offices, plaintiff toured the facilities and talked with Morton Kamerman, Haupt's managing partner. Plaintiff testified at his deposition that Kamerman told him that he had nothing to worry about, that Haupt was solid, that Haupt was making money, and that the stock exchange was in back of them. Plaintiff also stated that he knew Haupt was in the brokerage business, knew it was selling stocks and bonds, and did not inquire any further into the nature of the business. At this time, plaintiff also received a copy of Haupt's statement of financial condition as of May 29, 1963, which had been certified by Peat, Marwick, Mitchell & Co.

Plaintiff showed the statement of financial condition to his accountant, Milton Lieberman. Lieberman told plaintiff that he would need a more recent statement before he could evaluate Haupt. Plaintiff testified that he requested a more recent statement from David Teiger, that he was told that one was in process, but that he never received one. About this same period in time, plaintiff talked with his stockbrokers and with his banker, and was informed that Haupt had a good reputation. Prior to becoming a limited partner in Haupt, plaintiff also received a copy of Haupt's partnership agreement, which he did not review with either legal counsel or his accountant.

Article IX, section 7(a)(1) of the Exchange Constitution, as in effect in 1963, provides in relevant part that ". . . no member, allied member or member firm shall admit any person to partnership in a member firm, without the prior approval of the Board of Governors." Pursuant to Exchange Rule 311, as in effect in 1963, "[a] member who proposes . . . to admit any person as a participant in a member organization . . . shall notify the Secretary of the Exchange in writing before any such . . . admission, and shall submit such information as may be required by the Exchange."

On or about September 26, 1963 Exchange received plaintiff's application to be admitted as a limited partner in Haupt, which contained information on plaintiff's background and financial condition. Exchange reviewed its own records for information concerning plaintiff, made inquiries to two brokerage houses and one bank where plaintiff had dealings, and obtained from a private investigative agency a confidential report as to plaintiff's reputation, employment history, financial status, police record, and other related matters. In addition, plaintiff's name was placed in the weekly bulletins dated September 27, 1963 and October 4, 1963 under the heading "proposed admission" and in the weekly bulletin dated October 11, 1963 under the heading "personnel changes."

On October 10, 1963 Exchange approved plaintiff's application to become a limited partner in Haupt. This approval

was based on information supplied in plaintiff's application and obtained through Exchange's investigation and on the absence of information indicating that plaintiff had engaged in any fraudulent or dishonest acts or that his admission as a limited partner would hinder the maintenance of a fair and honest market for securities, fair dealing, just and equitable principles of trade, or the protection of public investors. Exchange did not require Haupt to disclose to plaintiff any information prior to his purchase of a limited partnership interest and did not investigate the appropriateness of such an investment by plaintiff.

On October 10, 1963 plaintiff became a limited partner in Haupt, investing $250,000. Prior to becoming a limited partner, plaintiff had no conversations with anyone from Exchange with respect to his investment, made no requests of Exchange for any information, and had no correspondence with Exchange. Exchange did not know what information had or had not been given to plaintiff by Haupt, with respect to Haupt, prior to his becoming a limited partner. Nevertheless, plaintiff testified at his deposition that he felt that Exchange was in back of the investment and that the investment was secure because of the amount of information he had to provide Exchange in his application.

During the period between April 1, 1960 and November 20, 1963, Haupt was a limited partnership formed pursuant to New York law. It conducted a general brokerage and commission business and was a member of Exchange.

In the fall of 1962 Allied Crude Vegetable Oil Refining Corporation ("Allied") was introduced to Haupt as a potential commodities customer. Allied was seeking export loans to finance overseas deliveries of crude vegetable oil as well as a commodities futures trading account. After twice rejecting the Allied account, Haupt entered into a "Letter of Intent" with Allied, dated May 23, 1963, setting forth terms under which Haupt would carry the Allied account. The "Letter of Intent" was signed by Ira Haupt, II, a general partner, on behalf of Haupt, and by Anthony "Tino" DeAngelis on behalf of Allied. Prior to the signing of the "Letter of Intent," Ira Haupt, II obtained approval for carrying the account from Kamerman, Haupt's managing partner.

On September 10, 1963 loans made by Haupt to Allied in the export loan account exceeded the "Letter of Intent's" maximum of $2,500,000 for the first time. On November 4, 1963 the total export loans to Allied amounted to $10,-000,000. These export loans were secured by warehouse receipts for quantities of vegetable oil. In addition to export loans, Haupt made loans to Allied to provide margin in Allied's commodities futures accounts. These margin loans were also secured by warehouse receipts.

In November 1963, Haupt was carrying on margin for Allied substantial long positions in cottonseed oil and soybean oil futures. On Friday, November 15, margin calls were made on Allied in the amounts of $1,151,000 and $5,127,000. An additional margin call in the amount of $9,216,000 was made on Allied on Monday, November 18. None of these margin calls were met, and on November 19, 1963 Allied filed a voluntary petition in bankruptcy.

Also on November 19, 1963, Haupt notified Exchange that it was below the net capital requirements of Exchange Rule 325 by approximately $187,000. On November 20, 1963 Exchange suspended Haupt under section 2 of Article XIII of the Exchange Constitution because it was determined that Haupt could not continue in business without danger to its creditors.

On November 20 and 21, 1963, the contracts in cottonseed and soybean oil were liquidated. Inspection of the tanks supposedly storing the vegetable oil which secured Haupt's export and margin loans to Allied revealed that there was no oil and that the warehouse receipts were fraudulent. An involuntary

petition in bankruptcy was filed against Haupt on March 23, 1964, and on June 24, 1964 Haupt was adjudicated a bankrupt.

During 1963, Exchange had 670 member organizations with approximately 31,941 registered personnel. In addition, 90,500 other persons were employed by member organizations at some 3,345 offices throughout the world.

Pursuant to Exchange Rule 416, Haupt submitted answers to three Exchange financial questionnaires in 1963. Haupt's answers to the Exchange special financial questionnaire as of February 28, 1963, which were received on March 25, 1963, revealed that Haupt's ratio of aggregate indebtedness to net capital as of February 28, 1963 was 1514 percent and that Haupt had "excess net capital" of $1,089,000. Haupt's answers to the Exchange regular financial questionnaire as of May 29, 1963 were received by Exchange on June 28, 1963. They were prepared by Peat, Marwick, Mitchell & Company after conducting a "surprise" audit of Haupt's books and records pursuant to Exchange Rule 418 and revealed an indebtedness to net capital ratio of 1410 percent and an "excess net capital" of $1,509,000. Haupt's answers to the Exchange special financial questionnaire as of September 26, 1963 were received by Exchange on October 21, 1963 and revealed that the indebtedness to net capital ratio as of September 26, 1963 was 1734 percent and that Haupt had "excess net capital" of $679,000. In connection with the special financial questionnaire as of September 26, 1963, an Exchange examiner commenced a routine visit to Haupt on November 12, 1963. He was still conducting his examination of Haupt's books and records when on November 19, 1963 Haupt informed Exchange of its financial difficulties.

Of his $250,000 investment, plaintiff has recovered in settlement of other re-

lated actions $10,000 in October 1968 from the Estate of Ira Haupt, and $135,000 in May 1971 from the bankruptcy estate of Ira Haupt & Co.

Plaintiff's amended complaint asserts two causes of action. The first alleges that in violation of its agreement with the Securities and Exchange Commission ("the SEC"), pursuant to section 6(a)(1) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78f(a)(1),[1] of which agreement plaintiff as an investor is a third-party beneficiary, Exchange failed to comply and to enforce compliance by Haupt with the Exchange Act, with the SEC rules promulgated thereunder, and with Exchange's own rules. Plaintiff's second cause of action charges Exchange with a direct violation of section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and SEC Rule 10b–5, 17 C.F.R. § 240.-10b–5, in that Exchange omitted to disclose material adverse information in connection with the sale to plaintiff of a limited partnership interest in Haupt.

### DISCUSSION

For convenience, the Court turns first to plaintiff's second cause of action.

*Second Cause of Action—Direct Violation of Section 10(b) and Rule 10b–5*

Plaintiff contends that by reason of its approval pursuant to Article IX, section 7(a)(1) of the Exchange Constitution and Exchange Rule 311, of plaintiff's application to become a limited partner in Haupt, Exchange was a participant in the sale of a limited partnership interest to plaintiff. Such participation, according to plaintiff, created a duty on behalf of Exchange to disclose to plaintiff any material adverse information about Haupt which it then knew or had reason to know. Therefore plaintiff asserts that by failing to disclose material adverse information about which it had actual knowledge, Exchange

---

1. Recent amendments to section 6(a), effective December 1, 1975, have eliminated the statutory requirement of an agreement as a condition to registration as a national securities exchange. Act of June 4, 1975, Pub.L.No. 94–29, § 4, 89 Stat. 104 (1975).

was in direct violation of section 10(b) and Rule 10b–5.

■ The evident purpose of requiring Exchange approval prior to the admission of a new partner in a member firm is to prevent persons who are not ethically and morally qualified from becoming involved in a firm dealing with public investors in the securities markets. Although plaintiff's apparent misunderstanding of Exchange's function in approving his application was unfortunate, there is nothing in Article IX, section 7(a)(1) of the Exchange Constitution, in Exchange Rule 311, or in Exchange's actions in rendering its approval, as indicated by the evidence, which could be said to impose upon Exchange any obligations to plaintiff. Contrary to plaintiff's assertions, the Court finds that the rendering of approval of plaintiff's admission as a limited partner in Haupt created no duty of disclosure on behalf of Exchange which could give rise to a direct violation of section 10(b) and Rule 10b–5. *See Lanza v. Drexel & Co.*, 479 F.2d 1277 (2d Cir. 1973); *Wessel v. Buhler*, 437 F.2d 279 (9th Cir. 1971); *Fischer v. Kletz*, 266 F.Supp. 180 (S.D. N.Y.1967).

Although under certain circumstances a stock exchange might be held liable under section 10(b) and Rule 10b–5 as an aider and abettor of a fraud perpetrated by others, *see Pettit v. American Stock Exchange*, 217 F.Supp. 21 (S.D.N.Y.1963), the Court does not understand plaintiff to be asserting such secondary liability in this case. Moreover, the duty said to give rise to stock exchange liability as an aider and abettor arises under section 6 of the Exchange Act, pursuant to which plaintiff here asserts an independent cause of action.

*First Cause of Action—Section 6*

Section 6 of the Exchange Act provides in relevant part:

"(a) Any exchange may be registered with the Commission as a national securities exchange under the terms and conditions hereinafter provided

in this section, by filing a registration statement in such form as the Commission may prescribe, containing the agreements, setting forth the information, and accompanied by the documents, below specified:

(1) An agreement (which shall not be construed as a waiver of any constitutional right or any right to contest the validity of any rule or regulation) to comply, and to enforce so far as is within its powers compliance by its members, with the provisions of this title, and any amendment thereto and any rule or regulation made or to be made thereunder; . . . ."

Pursuant to section 6 and SEC Rules 6a–1 and 6a–2, 17 C.F.R. §§ 240.6a–1, 240.6a–2, Exchange on or about May 31, 1963 filed an annual amendment to its application for registration which included the following provision:

"The New York Stock Exchange hereby agrees . . . to comply with and to enforce so far as within its powers compliance by its members with the provisions of Title 1 of the Securities Exchange Act of 1934 and any amendment thereto and any rule or regulation made or to be made thereunder."

In *Baird v. Franklin*, 141 F.2d 238 (2d Cir.), *cert. denied*, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944), the Court of Appeals held that section 6 imposes upon Exchange a statutory duty to regulate its member firms. However, liability arising directly from Exchange's breach of its statutory duty was apparently time-barred when plaintiff commenced this action. *See Weinberger v. New York Stock Exchange*, 335 F. Supp. 139 (S.D.N.Y.1971).

In an earlier opinion in this case, Judge Gurfein found that the agreement between Exchange and the SEC pursuant to section 6(a)(1) imposed a contractual duty upon Exchange and held that an investor as a third-party beneficiary may assert a claim for relief against Exchange for violation of that agreement.

*Weinberger v. New York Stock Exchange, supra.* Plaintiff contends that Exchange violated its agreement with the SEC by failing to enforce compliance by Haupt with section 10(b) of the Exchange Act and Rule 10b–5 and with Exchange Rule 405, which concerns knowledge of a member firm's customers and supervision of accounts. As in effect in 1963, Exchange Rule 405 provided in relevant part:

> "Every member organization is required through a general partner or an officer who is a holder of voting stock to
>
> (1) Use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization and every person holding power of attorney over any account accepted or carried by such organization.
>
> (2) Supervise diligently all accounts handled by registered representatives of the organization."

At the outset, Exchange contends that plaintiff as a limited partner has no standing to assert a breach of Exchange's contractual duty, which according to Exchange is solely for the benefit and protection of public customers of a member organization. In *New York Stock Exchange, Inc. v. Sloan,* 394 F.Supp. 1303 (S.D.N.Y.1975), Judge Lasker rejected a similar contention and held that a limited partner had standing to sue Exchange for violation of its statutory duty under section 6 to enforce compliance with Exchange rules pertaining to net capital and record-keeping requirements. Judge Lasker disapproved of a "categorical approach" to standing and pointed out that "the requirements for standing should be flexible enough to take account of the nature and intent of the particular Exchange rule whose violation is the subject of suit." 394 F.Supp. at 1310.

At least as to standing requirements, there appears to be no valid distinction between Exchange's statutory and contractual duties. Following the approach outlined in *Sloan,* the Court finds that plaintiff has standing to sue Exchange for failure to enforce compliance by Haupt with section 10(b) and Rule 10b–5 in connection with the sale to him of a limited partnership interest and for failure to enforce compliance by Haupt with Exchange Rule 405. Plaintiff as the purchaser of a "security" (as discussed below) is clearly intended to be protected by section 10(b) and Rule 10b–5. Moreover, Exchange Rule 405, the "know your customer" and account supervision rule, is intended to protect not only customers of a member firm, but also to protect a member firm against irresponsible and fraudulent actions by customers. As a limited partner, plaintiff entrusted his funds to Haupt and stood "in the kind of relationship to the firm which requires [him] to rely on its compliance" with this rule. *New York Stock Exchange, Inc. v. Sloan, supra,* at 1310. His interest in Haupt's proper observance of Exchange Rule 405 was substantial and entitles him to sue Exchange for failure to enforce compliance.

Another preliminary matter raised by Exchange with respect to plaintiff's claim that it failed to enforce compliance with section 10(b) and Rule 10b–5 is that a limited partnership interest is not a "security" within the meaning of these provisions, thereby making them inapplicable. Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10) defines "security" to include "any . . . investment contract." The Supreme Court has construed the term "investment contract" as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Securities & Exchange Commission v. W. J. Howey Co.,* 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). The Supreme Court has also counseled that the term "security" should be construed broadly and that "form should be disregarded for sub-

stance and the emphasis should be on economic reality." *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967).

■ In return for his $250,000 capital contribution to Haupt, plaintiff was to receive interest on this amount at the rate of 6 percent and also a 1 percent participation in the firm's profits, with a minimum yearly profit participation of $10,000. Plaintiff was not required to bear any losses and had no part in managing the business of Haupt. Under these circumstances, the Court finds no obstacle to concluding that plaintiff's limited partnership interest was an "investment contract" within the meaning of section 3(a)(10) and therefore a "security" within the meaning of section 10(b) and Rule 10b–5. *See New York Stock Exchange, Inc. v. Sloan, supra.*

■ To establish liability on the part of Exchange for breach of its contractual duty to regulate its member firms, plaintiff must prove "(1) that the Exchange had reason to believe or suspect that its member was acting in violation of the rules of the Exchange [the provisions of the Exchange Act, or any rule or regulation made or to be made thereunder]; (2) that the Exchange thereafter failed to take action; and, (3) that such failure to act resulted in injury to the plaintiff."[2] *Marbury Management, Inc. v. Kohn,* 373 F.Supp. 140, 143 (S.D. N.Y.1974). Plaintiff first contends that in connection with the sale to him of a limited partnership interest, Haupt violated section 10(b) and Rule 10b–5 by furnishing him a false and misleading financial statement and by failing to disclose material adverse information, and that Exchange had actual knowledge of facts which would give it reason to believe that Haupt was violating section 10(b) and Rule 10b–5.

During his visit to Haupt's offices in May or June 1963 to talk with David Teiger, plaintiff received a copy of Haupt's statement of financial condition as of May 29, 1963, which had been certified by Peat, Marwick, Mitchell & Co. According to plaintiff, this statement materially overstated the amount of the limited partners' capital accounts and Haupt's net worth.

On August 12, 1963 Exchange was informed by Haupt that Haupt's statement of financial condition as of May 29, 1963 was available to customers of Haupt. On or about that date, Exchange received a copy of Haupt's statement of financial condition and thereafter compared it with Haupt's audited answers to the regular financial questionnaire as of May 29, 1963, which had been received by Exchange on June 28, 1963. Upon comparison, Exchange discovered that the statement of financial condition carried securities held in limited partners' capital accounts at a value which exceeded by some $407,000 the amount used in the answers to the regular financial questionnaire to calculate net capital for the purpose of Exchange Rule 325, the net capital rule.

On October 1, 1963 representatives of Exchange and Haupt met with their respective counsel to discuss the difference. Haupt's counsel, I. Cyrus Gordon, submitted an opinion to the effect that under the Haupt partnership agreement, the full market value of all securities contributed by limited partners was available to meet the claims of creditors and should be considered firm capital for balance sheet purposes. Exchange's counsel conceded that this was a possible construction of Haupt's partnership agreement, but suggested that the partnership agreement should be amended to clarify this position. Haupt agreed to incorporate language in a new limited partnership agreement to be effective as of January 1, 1964 further clarifying the fact that the full market value of securities contributed by limited partners was at the risk of the business and

---

2. Although apparently set forth in the context of Exchange's statutory duty, no reason appears why these elements would not apply to Exchange's contractual duty.

was available to meet the claims of creditors. Moreover, in spite of the opinion of its counsel that full market value could be used for balance sheet purposes, Haupt's statement of financial condition as of May 29, 1963 carried the value of securities in the limited partners' capital accounts at less than full market value. The opinion of Haupts' counsel was subsequently confirmed by the New York State courts in an action by a limited partner in Haupt to recover securities which had a value in excess of his contract commitment in exchange for cash in the amount of his contract commitment. *Nexsen v. New York Stock Exchange,* 24 A.D.2d 514, 261 N.Y.S.2d 780 (2d Dept. 1965).

After receiving Haupt's answers to the regular financial questionnaire as of May 29, 1963, Exchange also calculated Haupt's net worth, as defined in Exchange Rule 325. Pursuant to Rule 325, this computation includes consideration of more than just capital accounts and undistributed profits. The net worth calculated by Exchange for Rule 325 purposes was approximately $557,000 less than the net worth shown on Haupt's statement of financial condition as of May 29, 1963. According to Exchange, some $407,000 of this difference is accounted for by the different methods used by Haupt and Exchange to value the securities in the limited partners' capital accounts, as pointed out above.

■ On the basis of the foregoing evidence, the Court finds that Haupt's statement of financial condition as of May 29, 1963 did not materially overstate either the amount of limited partners' capital accounts or Haupt's net worth. Plaintiff's calculations of such overstatements as set forth in plaintiff's post-trial memorandum are based on an improper comparison of the information contained in Haupt's answers to the regular financial questionnaire as of May 29, 1963 and Haupt's statement of financial condition as of May 29, 1963. In addition, the evidence shows that Exchange did take reasonable action to reconcile such discrepancies as were initially found to exist. Accordingly, no breach of Exchange's contractual duty pursuant to its agreement under section 6 has been shown.

Plaintiff also asserts various other items which he claims give rise to a violation by Exchange of its agreement to enforce Haupt's compliance with section 10(b) and Rule 10b–5. Plaintiff contends that he was never informed by Haupt that because of the deaths of various partners, including Ira Haupt, Sr., $1,650,000 of partnership capital was to be withdrawn on or before December 31, 1963. According to plaintiff, Exchange knew before October 10, 1963, the date when plaintiff purchased his limited partnership interest, that this amount was to be withdrawn and should have required Haupt to note this fact on its statement of financial condition or have investigated whether Haupt had disclosed this fact to plaintiff.

On or about June 10, 1963, at a time when Ira Haupt, Sr. was seriously ill, a representative of Exchange talked with Kamerman, Haupt's managing partner, about the general plans of the firm with regard to expansion, capital, and back office facilities and systems. Kamerman informed Exchange's representative that the back office was well organized and could handle 2½ times as much volume as it was presently handling; that efforts were being made to divorce from the firm the specialist business, which although for many years the mainstay and major asset of Haupt, had recently, and especially since the illness of Ira Haupt, Sr., become less and less an asset and more of a liability; that some of the money put into the firm by the Haupts was loaned to them by Kamerman's father; and that Kamerman was prepared at any time to put additional capital of his own into the firm, or to raise additional capital promptly, and saw no problem in raising any additional capital which might be necessary in the event of the death of Ira Haupt, Sr.

Ira Haupt, Sr. died on June 13, 1963. The value of his contribution to capital on that date was approximately $1,190,000 and his share of the profits amounted to about $120,000. According to the provisions of the partnership agreement, the capital interest of Ira Haupt, Sr. was to be withdrawn on December 31, 1963.

■■ Plaintiff has not shown that Haupt failed to comply with section 10 (b) and Rule 10b–5 with regard to disclosure to him of withdrawals of capital. The death of partners, and particularly a partner of the prominence of Ira Haupt, Sr., is generally public knowledge and not inside information. Prior to becoming a limited partner, plaintiff was given a copy of Haupt's partnership agreement, which indicated the capital contributions of the various partners and contained provisions dealing with capital withdrawals upon the death of partners. Therefore, the information necessary to determine that certain amounts of capital would be withdrawn on or before December 31, 1963 was available to plaintiff. Since plaintiff has not shown that Haupt failed to comply with section 10(b) and Rule 10b–5 in this regard, Exchange cannot be held liable for failing to enforce compliance. Moreover, even if Haupt could be found to have violated section 10(b) and Rule 10b–5, the evidence indicates that Exchange did investigate Haupt's situation at a time when Ira Haupt, Sr. was seriously ill. In view of the fact that the managing partner at that time represented to Exchange that he saw no problem in raising additional capital, Exchange's failure to require Haupt to indicate that certain amounts of capital would be withdrawn on or before December 31, 1963 by reason of the death of certain partners or to investigate whether Haupt disclosed this fact to plaintiff was not without justification and does not amount to a violation of Exchange's agreement under section 6.

■ Plaintiff's remaining contentions with regard to Exchange's failure to enforce Haupt's compliance with section 10 and Rule 10b–5 pertain to Exchange's alleged knowledge that Haupt's indebtedness to net capital ratio was overextended; that Haupt was unsuccessful in replacing deceased partners' capital; that Haupt proposed to change the nature of its business; and that on October 10, 1963, the date when plaintiff became a limited partner, Exchange knew that the answers to its special financial questionnaire as of September 26, 1963 were still outstanding. Plaintiff concedes that Exchange did not know what information had or had not been given to plaintiff by Haupt in respect of these matters, but seems to contend in spite of this fact that Exchange had reason to believe Haupt was violating section 10 and Rule 10b–5.

Haupt's answers to Exchange's financial questionnaires indicated that Haupt's net capital position changed from a ratio of 1514 percent and "excess net capital" of $1,089,000 on February 28, 1963 to a ratio of 1410 percent and "excess net capital" of $1,509,000 on May 29, 1963. It was not until October 21, 1963, after plaintiff's purchase of a limited partnership interest, that Exchange received Haupt's answers to the special financial questionnaire as of September 26, 1963, which indicated a decline in Haupt's net capital position to a ratio of 1734 percent and "excess net capital" of $679,000. Although Exchange recommended to Haupt that the ratio of aggregate indebtedness to net capital be kept below 1500 percent, Exchange Rule 325 was not violated until this ratio exceeded 2000 percent.

With regard to Haupt's lack of success in replacing deceased partners' capital, plaintiff contends that of the $1,650,000 needed by December 31, 1963, Exchange knew that only $250,000 had been raised prior to plaintiff's investment on October 10, 1963, because Exchange had to approve admission of new partners. Plaintiff also suggests that Exchange's knowledge that Haupt was planning to drop its specialist business,

which Haupt's managing partner had determined was becoming a drain on the firm, has relevance to Exchange liability for violation of its agreement under section 6. Finally, plaintiff argues that Exchange knew on October 10, 1963 that Haupt's answers to the special financial questionnaire as of September 26, 1963 were outstanding and were due to be filed shortly. Plaintiff seems to contend that had he known this, he would not have purchased a limited partnership interest on October 10. However, plaintiff testified at his deposition that he was informed by his accountant that a more recent statement than the statement of financial condition as of May 29, 1963 was necessary before the accountant could evaluate Haupt. Plaintiff also stated that he asked for a more recent statement and was told one was in process. Nevertheless, plaintiff went ahead and purchased a limited partnership interest without seeing a financial statement more recent than Haupt's statement of financial condition as of May 29, 1963.

The Court has considered plaintiff's contentions and the evidence bearing on these last matters and finds that plaintiff has failed to establish that Exchange is liable to him for failure to enforce compliance by Haupt with section 10(b) and Rule 10b–5. Analysis of Exchange's obligation to plaintiff pursuant to its agreement under section 6 has been complicated throughout by plaintiff's failure in raising his contentions to distinguish between a direct duty of disclosure owed to plaintiff by Exchange under section 10(b) and Rule 10b–5, which theory the Court has rejected, and the contractual duty of Exchange to enforce compliance by Haupt with section 10(b) and Rule 10b–5. Plaintiff in each of these last instances has not only failed to show that Exchange had reason to believe or suspect that Haupt was violating section 10(b) and Rule 10b–5 in connection with the sale to plaintiff of a limited partnership interest, but also has failed to show that Haupt did in fact violate section 10(b) and Rule 10b–5. Nor has any showing been made that Exchange failed to use reasonable diligence in discharging its obligations under its agreement with the SEC pursuant to section 6. *See Rich v. New York Stock Exchange,* 522 F.2d 153 (2d Cir. 1975).

In addition to his claim with regard to section 10(b) and Rule 10b–5, plaintiff contends that Exchange violated its agreement under section 6 by failing to enforce compliance by Haupt with Exchange Rule 405, the "know your customer" and account supervision rule. Exchange investigation into the collapse of Haupt resulted in the drafting of a memorandum of charges against Morton Kamerman, Haupt's managing partner, for among other transgressions, violations of Exchange Rule 405. Although these charges were never adjudicated because Kamerman left the securities business and therefore was no longer under Exchange jurisdiction, they provide, together with the nature of Allied's fraud upon Haupt, a sufficient basis on which to assume for the purposes of this action that Haupt did in fact violate Exchange Rule 405.

As a threshold issue, Exchange contends that it had no contractual duty to enforce compliance by Haupt with Exchange rules, arguing that a distinction should be made between its contractual duty and its statutory duty under section 6. Judge Gurfein in his prior opinion in this case observed in a footnote that "[s]ince the Exchange is already liable for any breach of its statutory duty, the imposition of a virtually *coterminous* contractual duty will not have the disruptive effect of an unexpected civil liability . . . ." (Emphasis added.) *Weinberger v. New York Stock Exchange, supra,* at 144 n. 10. Moreover, in *Baird v. Franklin, supra,* the Court of Appeals held that sections 6(b) and (d) of the Exchange Act, 15 U.S.C. § 78f(b), (d),[3] impose upon Exchange a

---

3. Section 6(b) and (d) of the Exchange Act provide:

"(b) No registration shall be granted or remain in force unless the rules of the ex-

duty to enforce its own rules. By not enforcing its own rules, Exchange would therefore be violating its agreement under section 6(a)(1) by failing to comply with the provisions of the Exchange Act.

 To establish liability on the part of Exchange for failure to enforce compliance by Haupt with Exchange Rule 405, plaintiff must show that Exchange had reason to believe or suspect that Haupt was acting in violation of that rule. *Marbury Management, Inc. v. Kohn, supra.* Plaintiff contends that Haupt's answers to the Exchange special financial questionnaire as of September 26, 1963, which were received by Exchange on October 21, 1963, indicated a deterioration of Haupt's capital position and contained enough information about Haupt's commodities activities that routine follow up would have revealed violations of Exchange Rule 405.

 Haupt's answers to the Exchange special financial questionnaire as of September 26, 1963 revealed that Haupt's net capital position had changed from a ratio of 1410 percent and "excess net capital" of $1,509,000 on May 29, 1963 to a ratio of 1734 percent and "excess net capital" of $679,000 on September 26, 1963, which was still within the requirements of Exchange's net capital rule. In addition, the answers indicated a large increase in Haupt's commodities business since May 29, particularly in cottonseed oil contracts. However, Haupt's answers did not themselves show any violations of Exchange Rule 405.

On November 12, 1963 an Exchange examiner commenced a routine visit to Haupt in connection with the special financial questionnaire as of September 26, 1963. From November 12 until November 15, he examined the work papers and general ledgers used by Haupt in preparing its answers to the financial questionnaire and reverified Haupt's computation of its indebtedness to net capital ratio. Starting on November 15 or November 18, he examined the securities accounts in Haupt's margin department to determine whether the accounts were properly margined and the securities properly segregated. This part of the examination was interrupted on November 19, 1963 when Haupt informed Exchange that it was below the net capital requirements of Exchange Rule 325. Haupt was suspended on November 20, and the examiner never reached the commodities department.

Although Exchange's examiner had not yet reached the commodities department when Haupt on November 19 informed Exchange of its financial difficulties, plaintiff contends not only that Exchange should be charged with knowledge of what that examination would have revealed, but also that Exchange should be charged with that knowledge as of October 21, 1963, the date when Exchange received Haupt's answers to the special questionnaire as of September 26, 1963. However, the Court finds no support for this contention. Although the answers indicated a declining capital position and a large increase in Haupt's commodities business, they disclosed no violation of Exchange Rule 405. Before Exchange was able to uncover any such violation through its examination, Haupt was suspended under the Exchange Constitution. Accordingly, the Court finds that plaintiff has failed to show that prior to Haupt's suspension Exchange had reason to believe or suspect that Haupt was acting in violation of Ex-

change include provision for the expulsion, suspension, or disciplining of a member for conduct or proceeding inconsistent with just and equitable principles of trade, and declare that the willful violation of any provisions of this title or any rule or regulation thereunder shall be considered conduct or proceeding inconsistent with just and equitable principles of trade.

\* \* \* \* \*

"(d) If it appears to the Commission that the exchange applying for registration is so organized as to be able to comply with the provisions of this title and the rules and regulations thereunder and that the rules of the exchange are just and adequate to insure fair dealing and to protect investors, the Commission shall cause such exchange to be registered as a national securities exchange."

change Rule 405. Moreover, plaintiff has not shown that Exchange failed to take adequate measures to discharge its obligations under its agreement with the SEC pursuant to section 6, particularly in view of the fact that in 1963 Exchange had, in addition to Haupt, 669 member organizations to which its contractual obligations also extended. The evidence indicates that Exchange used reasonable diligence to supervise Haupt's activities in 1963 by means of three financial questionnaires and was in the process of examining Haupt's books and records when Haupt was suspended. The collapse of Haupt resulted, at least in part if not entirely, from the fraud perpetrated upon it by Allied, and there is nothing in the record to suggest that Exchange knew or could have known about this fraud.

Plaintiff's amended complaint also alleges that Exchange failed to promulgate adequate rules with regard to supervision within member organizations. However, plaintiff's remedy for any claimed inadequacy in Exchange's existing rules lies with the SEC pursuant to its authority under section 19(b) of the Exchange Act, 15 U.S.C. § 78s(b). *Marbury Management, Inc. v. Kohn, supra; Kroese v. New York Stock Exchange,* 227 F.Supp. 519 (S.D.N.Y.1964).

The foregoing constitutes the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

Judgment in favor of Exchange dismissing the amended complaint may be entered accordingly.