James ARNEIL and Vernon A. Stockwell,
Plaintiffs-Appellants,

v.

James B. RAMSEY, Jr., et al.,
Defendants-Appellees.

No. 321, Docket 76–7305.

United States Court of Appeals,
Second Circuit.

Argued Dec. 8, 1976.

Decided Feb. 16, 1977.

Jeffrey A. Fillman, New York City (J. Thomas Hannan, San Francisco, Cal., and Finley, Kumble, Wagner, Heine, Underberg & Grutman, New York City, on the brief), for plaintiffs-appellants.

Robert A. Meister, New York City (Robert Thomajan and Milgrim Thomajan & Jacobs Professional Corp., New York City, on the brief), for defendants-appellees Ramsey, Vanderbilt and Lendman.

Edward J. Reilly, New York City (Norman R. Nelson and Milbank, Tweed, Hadley & McCloy, New York City, on the brief), for defendant-appellee New York Stock Exchange.

Before MEDINA, OAKES and GURFEIN, Circuit Judges.

MEDINA, Circuit Judge:

Plaintiffs, two private investors, appeal from an order of the United States District Court for the Southern District of New York granting summary judgment for defendants and dismissing plaintiffs' complaint in full against three former officers of a now defunct brokerage firm and in part against the New York Stock Exchange. Determining that there was no just reason for delay, the District Court directed entry of final judgment against the investors, pursuant to Fed.R.Civ.P. 54(b). The opinion below is reported, 414 F.Supp. 334 (S.D.N.Y.1976). To decide this appeal, we must consider the application of New York's "borrowing statute," N.Y.C.P. L.R. Section 202, in the context of an alleged securities fraud, as well as the scope of protection afforded by Section 6 of the Securities Exchange Act of 1934, 15 U.S.C. Section 78f.

This action was commenced on April 11, 1975, almost six years after the transactions in suit. The complaint alleged in fourteen separate "counts" numerous violations of the Securities Exchange Act of 1934, especially Sections 6 and 10(b), as well as common law fraud. Because of their critical role in resolving the numerous issues raised by the parties, the facts must be set forth in detail greater than usual.

I

Plaintiff James Arneil is an attorney. Plaintiff Vernon A. Stockwell is the general manager and half owner (with Arneil) of two apple orchards in Washington state. Both are longtime residents of Washington. In 1969 each had a net worth in excess of $1,000,000 and had regularly bought and sold securities. The two men had maintained brokerage accounts, including one jointly, with a number of firms, and, in 1969, they were plaintiffs in actions in the Southern District of New York against the brokerage house of Reynolds & Co. for damages arising from stock transactions in 1963.[1]

Defendant Blair & Co. was a stockbroker and member organization of defendant New York Stock Exchange until September 25, 1970, when Blair ceased operations and a liquidator was appointed. On September 29, 1970, an involuntary petition in bankruptcy was filed against Blair, and, as a

---

1. *Arneil v. Reynolds & Co.*, 65 Civ. 944 (S.D.N.Y.), and *Stockwell v. Reynolds & Co.*, 65 Civ. 945 (S.D.N.Y.), were consolidated for all purposes and settled during trial; Consent and Order of Discontinuance were filed June 18, 1969.

result, the portion of this action against Blair was stayed. Defendants Ramsey and Lendman are former presidents of Blair, and defendant Vanderbilt is a former chairman of Blair's board.

On February 28, 1969, Blair had acquired the brokerage firm of Schwabacher & Co., a California partnership, which had been a member of the New York Stock Exchange since 1930. Schwabacher had been in violation of certain Exchange rules between April 1966 and March 1967, and the Exchange had imposed various operating restrictions on Schwabacher in February 1968. In March of 1968 the Exchange learned from independent auditors of difficulties in completing the audit of Schwabacher, and further deficiencies in Schwabacher's position were soon discovered. Near the end of 1968, the Exchange determined that Schwabacher would have to merge with another broker or cut back its operations.

On December 13, 1968, it was publicly announced that Schwabacher would merge with Blair. The merger became effective on February 28 or March 1, 1969, after it was approved by the Exchange. At that time, Blair itself was under investigation by the Exchange for possible violations of the net capital rule as of May 31, 1968.

Plaintiffs allege that in early 1969 Blair solicited them to buy its securities and invest in the firm. They did, and, in the transaction giving rise to this suit, each purchased $15,000 worth of Blair stock, executed Secured Demand Notes ("SDNs"), and deposited $150,000 worth of securities as collateral therefor in a subordinated account with Blair. By means of the SDNs, plaintiffs made loans to Blair which it could use in computing its net capital. In return, they were to receive interest on the loan from Blair, as well as the normal dividends and gains on the collateral. Because stock in brokerage houses could not at that time be publicly traded [2] and Arneil and Stockwell were becoming lenders to a member of the Exchange, the two men had to complete special New York Stock Exchange "Allied Member or Non-Member Applications," pursuant to Exchange rules. The transaction required Stock Exchange approval, which was obtained on July 3, 1969.[3]

Conversations concerning the transaction were held over the telephone between Blair in New York and plaintiffs in the State of Washington, and all written communications were mailed to or by plaintiffs in Washington. On April 16, 1969, each man mailed his check for $15,000—drawn on a Washington bank—for the purchase of the Blair stock, along with most of the stock certificates to be deposited as collateral in the subordinated accounts. The stock and the SDN accounts were maintained by Blair in New York. Plaintiffs contend that the purchase documents they sent to Blair were signed by them in blank and were to be completed and accepted by Blair in New York, and that the checks they sent could not be negotiated until the transactions were approved by Blair and by the Stock Exchange.

Four months later, on August 28, 1969, the SEC issued a public release announcing violations of its financial, bookkeeping and reporting regulations by Schwabacher, now a division of Blair, and setting forth the disciplinary measures imposed by it and the Exchange. This release was carried in the Wall Street Journal on August 29th.

In March 1970 Blair mailed a letter to its stockholders, including Arneil and Stock-

2. It was not until 1953 that stock exchange members could incorporate, and not until 1970 that member corporations could issue certain freely transferable securities.

3. To become a stockholder of a member corporation, the Exchange required that a person execute an application for approval by the Exchange's Board of Directors. According to the Exchange, the purpose of this application procedure was to determine that the applicant had the requisite qualifications for ownership of an interest in a member corporation, and was not intended to review the circumstances of the transaction between the applicant and the member organization. Affidavit of Robert M. Bishop, Senior Vice President of the New York Stock Exchange, Inc., submitted in support of the Exchange's motion for summary judgment, ¶ 4.

well, advising them that it had adopted a plan to obtain "a substantial amount of badly needed senior capital on a long-term basis" and noting the "absence of any book value" for Blair's stock. A month later over $11,000,000 of subordinated accounts belonging to so-called Blair "insiders" were liquidated to provide working capital. It does not appear from the record that plaintiffs were aware of this fact at that time.

During July of 1970, plaintiffs learned that the affairs of Blair had deteriorated to a point where their investment was about to be liquidated. On July 23rd, Stockwell, on behalf of Arneil and himself, wrote to Blair that they had been advised by their broker, a Mr. McNell of Blair, that some or all of the "outside" SDN accounts were about to be liquidated. They protested that they did not want their accounts liquidated. They also stated that "[t]he extremely critical nature of Blair's problems were [sic] not known by us until this time," and that "[p]roper disclosure of impending developments of the affairs of Blair & Company, Inc., having a material bearing on our willingness to participate in a 'Secured Demand Notes and Stock Purchase Agreement' has not been made to us by Blair & Company, Inc." Stating that they "regard this transaction as being an uncompleted transaction and as being invalid," they further demanded that the stocks and cash then in their accounts be returned to them forthwith. The next day they sent a copy of the letter by registered mail to defendant Ramsey, then Blair's president. In a handwritten note covering the letter, they reiterated their demand for the immediate return of their accounts and advised that they "will take immediate action against Blair & Co. & against any individual representing Blair & Co. who disposes of the stock in any way except by returning the stock to us."

Two weeks later, on August 5th, Blair sent letters to Arneil and Stockwell demanding payment of their secured notes. This letter stated that Blair "expected that a working capital deficiency will develop within the next few days," referred to the April liquidation of insiders' accounts, ad-vised that Blair was not in compliance with the Exchange net capital rules, stated that operating restrictions had been imposed, and informed plaintiffs that unless their notes were paid their subordinated accounts would be liquidated in the next few days in connection with the Exchange-ordered sale or closing of Blair's branch offices. On the same day Blair sent telegrams to plaintiffs demanding payment of the SDNs and advising them that absent payment their accounts were scheduled to be liquidated on August 7th.

On August 13th, the Exchange publicly announced that Blair had terminated its public business "because of capital problems." This report was published in the Wall Street Journal on August 14th.

On about August 15th, plaintiffs received a telegram from one James P. Foley, Jr., a fellow Blair investor, advising them of an "emergency meeting of subordinated security holders of Blair & Co." to be held in New York on August 21st, "independent of Blair management, to compare notes and examine our mutual interests in the light of Blair's condition and conduct[.]" At the request of plaintiffs their lawyers in New York appeared at the meeting on their behalf.

Blair's subordinated lenders were sent a letter by defendant Ramsey on September 25, 1970, informing them that the Exchange had appointed a liquidator for Blair that day and inviting them to attend a meeting to discuss the effect of the appointment on the firm. On September 29th, an involuntary petition in bankruptcy was filed against Blair.

Apparently the next action taken by Arneil and Stockwell with regard to the transactions in issue was the filing of this suit on April 11, 1975. In it they alleged that the three individual defendants had devised a fraudulent scheme to obtain badly needed capital without disclosure of the true financial condition of Blair and that this conduct constituted common law fraud and violations of Sections 10(b) and 20(a) of the 1934 Securities Exchange Act. They also claimed that the New York Stock Exchange

knowingly participated in part of the scheme and, while knowing that both Blair and Schwabacher were in violation of numerous securities laws and regulations and were of unsound financial condition, yet approved their merger and failed to enforce their compliance with those laws and regulations, thereby violating Sections 10(b), 20(a) and 6 of the Exchange Act and committing a common law fraud.[4]

The District Court, Judge Charles L. Brieant, Jr., gave summary judgment for the individual defendants on all claims or counts against them, and for the Exchange on ten of the counts against it, including the Section 10(b) and Section 20(a) counts, as well as the common law fraud count. Summary judgment was denied the Exchange on four counts alleging damages sustained because of its violations of Section 6(a)(1) and (b) of the Exchange Act.

The District Court held that with respect to all defendants, those counts alleging violations of Sections 10(b) and 20(a) of the Exchange Act (Counts 1 through 4) were governed by the three-year statute of limitations of plaintiffs' home state, Washington, and not by the six-year statute of New York as plaintiffs had contended, and so were time barred. Summary judgment was also granted for the Exchange on plaintiffs' Count 12, which claimed a violation by the Exchange of its alleged Section 6(a) duty to enact rules for the protection of private investors, the court holding that no such duty exists. As there were other counts not resolved, the District Court certified that there was no just reason for delay and directed entry of final judgment, Fed. R.Civ.P. 54(b), for the three individual defendants on all counts and for the Exchange on the ten counts on which summary judgment was granted. Rule 54(b) certification was made on June 1, 1976, directing entry of final judgment dismissing the complaint in its entirety as against the individual defendants and dismissing Counts I, II, III, IV, VI, IX, X, XII, XIII and XIV as against the New York Stock Exchange. Judgment was entered on June 2, 1976. As to the four remaining counts, V, VII, VIII and XI, the Stock Exchange's motion for summary judgment was denied, and the Exchange, of course, has taken no appeal from that interlocutory order.

The only issues properly before us on this appeal are, first, whether the Washington statute of limitations was properly applied, and, second, whether a cause of action under Section 6 of the Exchange Act may be inferred in favor of investors in a member firm of a securities exchange. We answer the first question "yes," the second "no,"

---

4. Section 10(b), 15 U.S.C. Section 78j, provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Section 20(a), 15 U.S.C. Section 78t, provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

At all times relevant to this action, Section 6, 15 U.S.C. Section 78f, read, in pertinent part:

(a) Any exchange may be registered with the Commission as a national securities exchange under the terms and conditions hereinafter provided in this section, by filing a registration statement in such form as the Commission may prescribe, containing the agreements, setting forth the information, and accompanied by the documents, below specified:

(1) An agreement (which shall not be construed as a waiver of any constitutional right or any right to contest the validity of any rule or regulation) to comply, and to enforce so far as is within its powers compliance by its members, with the provisions of this chapter, and any amendment thereto and any rule or regulation made or to be made thereunder[.]

and affirm the judgment of the District Court.

## II

■ We hold that the statute of limitations applicable to the first four counts is the three-year statute of Washington.

Because the provisions of the federal statute sued upon do not specify a limitations period, this court, in determining whether the action is timely brought, must refer to the statute of limitations of the forum state, New York. *Cope v. Anderson,* 331 U.S. 461, 67 S.Ct. 1340, 91 L.Ed. 1602 (1947); *UAW v. Hoosier Cardinal Corp.,* 383 U.S. 696, 703–704, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966); *Sack v. Low,* 478 F.2d 360, 365 (2d Cir. 1973). This includes reference to New York's "borrowing statute," N.Y.C.P. L.R. Section 202.[5] *Cope v. Anderson, supra.* Under that statute, if the instant causes of action "accrued" in Washington, then this suit is barred if either New York's or Washington's limitations period has expired.

In *Sack v. Low, supra,* 478 F.2d at 366, this Court, in the absence of New York decisions directly in point, decided that a cause of action for fraud under Section 10(b) of the Exchange Act arises where "its economic impact is felt, normally the plaintiff's residence." We find nothing to indicate that New York law has changed in this respect (*see, e.g., Korn v. Merrill,* 403 F. Supp. 377, 385 (S.D.N.Y.1975), aff'd with oral opinion, 538 F.2d 310 (2d Cir. 1976)), and we apply the *Sack* rule here.

Plaintiffs argue that under the principles enunciated in *Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963), we must "group the contacts" which each of New York and Washington has with this case and, when we have done so, conclude that New York's contacts are greater and, therefore, apply New York's six-year statute of limitations for fraud, now C.P.L.R. Section 213(8), rather than

Washington's three-year statute. We reject these contentions.

*Babcock* dealt with choice-of-law for the purpose of determining a defendant's culpability; it did not consider the question of where a cause of action accrued and dealt not at all with the statute of limitations. As we have previously observed, *Sack v. Low, supra,* 478 F.2d at 366–367, even where application of New York's choice-of-law principles points to the selection of the substantive law of a particular state, it does not follow

> that New York would rule that the state whose law is chosen to govern a defendant's conduct is necessarily the state where the cause of action accrued for purposes of its borrowing statute[,]

and this is the issue before us.

Plaintiffs misread *Babcock* if they interpret it as requiring us merely to list the contacts, tot them up, and choose the limitations statute of the state whose list is the longer. As Chief Judge Fuld wrote in *Neumeier v. Kuehner,* 31 N.Y.2d 121, 127, 335 N.Y.S.2d 64, 69, 286 N.E.2d 454, 457 (1972):

> When, in *Babcock v. Jackson* * * *, we rejected the mechanical place of injury rule in personal injury cases because it failed to take account of underlying policy considerations, we were willing to sacrifice the certainty provided by the old rule for the more just, fair and practical result that may best be achieved by giving controlling effect to the law of the jurisdiction which has the greatest concern with, or interest in, the specific issue raised in the litigation.

To the extent New York has a concern in the case before us—where a federal claim for relief is the principal one asserted—it is in the application of its borrowing statute, and that is

> to protect New York resident-defendants from suits in New York that would be barred by shorter statutes of limitations

**5.** That section provides:

> An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place

without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply. (McKinney 1972)

in other states where non-resident-plaintiffs could have brought suit. *Sack v. Low, supra*, 478 F.2d at 367. Plaintiffs here have demonstrated no reason why these defendants could not have been sued in Washington other than that Washington's statute of limitations had already run.

Nor are we persuaded by arguments characterizing the "place of injury" rule as "mechanical." The New York courts themselves recognize that the scope of *Babcock* is not unlimited.

> What the *Babcock* case * * * taught and what modern day commentators largely agree is that *lex loci delictus* is unsoundly applied if it is done indiscriminately and without exception. It is still true, however, that *lex loci delictus* is the normal rule * * *.

*Neumeier v. Kuehner, supra*, 31 N.Y.2d at 131, 335 N.Y.S.2d at 72, 286 N.E.2d at 459 (concurring opinion of Judge Breitel).

Similarly, we find to be without application to this case the dictum in *Sack v. Low, supra*, 478 F.2d at 368, on which plaintiffs so heavily rely, that

> perhaps if the plaintiffs maintained an open account at defendant's New York offices, and the loss was reflected in that account, this might make some difference.

Both Arneil and Stockwell are longtime residents of Washington. Each maintained his bank accounts there. As consideration for the Blair stock, each sent Blair from Washington a check for $15,000 drawn on his home bank. As his contribution to the SDN account, each provided 5600 shares of stock, and certificates for all but 3300 of the total 11,200 shares were mailed from Washington. When these shares were liquidated and subsequently lost, the injury was felt in Washington. Plaintiffs maintain that the choice of a statute of limitations ought not

to depend on happenstance, and they suggest that the location of their residence was a fortuity. We believe, however, that to the extent they suffered a financial loss from their transaction with Blair, they suffered it in Washington. To the extent they became poorer men, they became poorer Washingtonians.

For the purposes of New York's borrowing statute, then, the first four counts must be taken to have accrued in Washington. Washington's three-year statute of limitations for actions founded upon fraud, Wash. Rev.Code Section 4.16.080(4), has been held applicable to Section 10(b) claims, *Douglass v. Glenn E. Hinton Investments, Inc.*, 440 F.2d 912, 914–916 (9th Cir. 1971), and we hold that it is applicable here. Since it is shorter than New York's six-year statute, C.P.L.R. Section 213(8), the borrowing statute commands that it control.

■ While state law fixes the length of the limitations period, federal law determines when the period begins to run. *Moviecolor Limited v. Eastman Kodak Company*, 288 F.2d 80, 83 (2d Cir.), *cert. denied*, 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed.2d 26 (1961); *cf. Cope v. Anderson, supra*, 331 U.S. at 464, 67 S.Ct. at 1342. We have said that

> the time from which the statute of limitations begins to run is not the time at which a plaintiff becomes aware of all of the various aspects of the alleged fraud, but rather the statute runs from the time at which plaintiff should have discovered the general fraudulent scheme. "[T]he statutory period . . . [does] not await appellant's leisurely discovery of the full details of the alleged scheme."

*Klein v. Bower*, 421 F.2d 338, 343 (2d Cir. 1970).

*Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 410 (2d Cir. 1975).[6] Thus, we must decide when plaintiffs learned facts

---

**6.** The courts of Washington have long applied a similar rule.

> The statute of limitations begins to run, not only upon discovery of fraud, but also from the time when the fraud should have been discovered; and a clue to the facts, which, if diligently pursued, would lead to a discovery,

is in law equivalent to discovery itself. Notice sufficient to excite attention and put a person on guard or to call for an inquiry is notice of everything to which such inquiry might have led.

*Tjosevig v. Butler*, 180 Wash. 151, 38 P.2d 1022, 1025 (1934).

sufficient in law to put them on notice of the existence of the alleged fraud.

### A. The Individual Defendants

■ We believe that the facts alleged in appellants' complaint justified the District Court's conclusion that, in the exercise of reasonable diligence,[7] plaintiffs should have discovered the alleged fraud well before April 11, 1972—that is, more than three years before they commenced this suit. ¶ 51 of the complaint states that on or about August 28, 1969, Schwabacher & Co. and Albert Schwabacher, Jr., admitted in a publicly issued SEC release "*willful* violations of the recordkeeping, reporting and hypothecation provisions of the Exchange Act" and rules promulgated thereunder (emphasis in complaint). In addition, plaintiffs alleged in ¶ 54 that

On or about August 14, 1970 defendant N.Y.S.E. [New York Stock Exchange] named five firms (including Blair) who were in serious peril and on or about September 28, 1970 a liquidator was named to wind up the business of Blair.

These public indications of Schwabacher's violations and Blair's financial difficulties support the conclusion that plaintiffs could have discovered the alleged fraud by April 1972, more than two and a quarter years after the events transpired and three years before plaintiffs commenced this action. Moreover, ¶ 34 of the complaint alleges that around March of 1969 Blair ran an advertisement in "a national publication" claiming that it was in fine financial shape and stating that "*we [Blair] think that stock in Blair & Co. would be an excellent 'growth' investment . . . if it were available to the public*" (emphasis in complaint). As quoted in the complaint, that advertisement also referred to

the importance to the investing community of the new Blair & Co. as we expand * * * with the addition of * * *

the well-known San Francisco-based firm of Schwabacher & Co., which now becomes the Western Division of Blair & Co.

Given that five months after this advertisement appeared, as plaintiffs themselves alleged in ¶¶ 51, 54 and 55, Schwabacher publicly admitted willful securities laws violations and a year and a half later Blair was publicly described as "in peril" and was soon placed in bankruptcy, we are of the opinion that investors of the scale and experience of these plaintiffs should have been put on notice to look deeper. *Klein v. Bower*, 421 F.2d 338, 343 (2d Cir. 1970); *Hupp v. Gray*, 500 F.2d 993, 996–997 (7th Cir. 1974); *Rickel v. Levy*, 370 F.Supp. 751, 756 (E.D.N.Y.1974). We consider important and significant in this regard the fact that James P. Foley, Jr., the Blair investor who had called the August 21, 1970 "emergency meeting of subordinated security holders," commenced actions against Vanderbilt, Ramsey and others in 1970 and against the Exchange in 1971.[8]

Plaintiffs argue that the "federal equitable tolling doctrine" stayed commencement of the statute of limitations until they discovered the facts constituting the alleged fraud. But this doctrine has application only where the plaintiff has "exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud," and "[u]nawareness of facts or law, alone, does not justify suspending the operation of the statute." *Morgan v. Koch*, 419 F.2d 993, 997 (7th Cir. 1969). Yet, while in his letter of July 23, 1970, Stockwell admitted knowledge at that time of "[t]he extremely critical nature of Blair's problems," there is nothing to indicate that he or Arneil took any action to learn the facts which would have disclosed the fraud.

We therefore conclude that with the exercise of reasonable efforts plaintiffs could

---

7. *Berry Petroleum Co. v. Adams & Peck, supra*, 518 F.2d at 411.

8. *J. P. Foley & Co., Inc. et al. v. Vanderbilt et al.*, 65 F.R.D. 523 (S.D.N.Y.1974), is currently pending in the Southern District of New York.

In *J. P. Foley & Co., Inc., et al. v. New York Stock Exchange and American Stock Exchange*, 71 Civ. 2987 MEL (S.D.N.Y.), an appeal to this court was docketed on December 10, 1976, following a jury verdict for defendant Stock Exchange.

have discovered the alleged fraud by April 11, 1972, three years before they commenced this action, and, consequently, the first four counts are barred by Washington's three-year statute of limitations.

### B. *The Stock Exchange*

■ The first four counts against the New York Stock Exchange are likewise barred by Washington's statute of limitations.[9]

Plaintiffs' knowledge, acquired at the time they entered the transaction in suit, that investments and transactions of that sort required Stock Exchange approval, coupled with their claims of reliance upon the Exchange's role of supervision and approval, was sufficient to lead a reasonably prudent investor to investigate further when Blair's condition soon proved to be so different from what had earlier appeared. There were thus sufficient allegations on the face of the complaint to justify the conclusion of the District Court that the statute of limitations began to run in favor of the Exchange well before April 1972.

■ Relying on *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), however, plaintiffs contend that even if the statute had begun to run by then, it was tolled on March 8, 1973, by the filing of a class action against the Exchange in the Northern District of California, *Carr v. New York Stock Exchange*, reported at 414 F.Supp. 1292 (N.D.Cal.1976).[10]

Under *American Pipe*, 414 U.S. at 554, 94 S.Ct. at 766,

the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class

who would have been parties had the suit been permitted to continue as a class action.

*Carr* was filed on March 8, 1973, on behalf of former employees of Blair who had been employees of Schwabacher, alleging the same general delinquencies of the Exchange as were pleaded here. Since neither Arneil nor Stockwell was ever an employee of Blair, neither was an "asserted member" of the class. On December 18, 1974, leave was sought to amend the complaint in *Carr* to expand the plaintiff class to include all who bought Blair securities after March 9, 1969, and before the omitted material facts were publicly disclosed. Such a class, of course, would include Arneil and Stockwell. Leave to amend was granted, and an amended complaint was filed on March 28, 1975. A motion to certify the class was denied on April 30, 1976. 414 F.Supp. 1292.

Plaintiffs contend that the filing of the amended complaint in *Carr* in March 1975 related back to the filing of the original complaint in March 1973, thereby suspending the statute as to them as of the latter date. We cannot agree. Arneil and Stockwell could not qualify as "asserted members" of the plaintiff class in *Carr* until December 18, 1974, at the earliest, when leave was sought to expand the class to include them. Relation back, at least on the facts of this case, would not accord with one of the rationales of *American Pipe*, that commencement of the class action adequately notifies the defendants

not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment. Within the period set by the statute of limitations, the defendants

9. Because we hold that the claim based on Section 20(a) of the Exchange Act, which makes a "controlling person" liable for the Exchange Act violations of any person it controls, is barred by the statute of limitations, we need not reach the question of whether Section 20(a) liability should in any circumstances arise against a stock exchange.

10. Plaintiffs contend that the statute was tolled as to all defendants. However, nothing in

*American Pipe* suggests that the statute be suspended from running in favor of a person not named as a defendant in the class suit, and we decline so to extend the rule. A different conclusion would not comport with reason.

As the only defendants in *Carr* are the New York and American Stock Exchanges and others called only "Does," *American Pipe* does not avail plaintiffs here with respect to the individual defendants.

have the essential information necessary to determine both the subject matter and size of the prospective litigation * * *. 414 U.S. at 554–555, 94 S.Ct. at 767. Commencement of *Carr* did not notify the Exchange of the generic identities of Arneil and Stockwell or of their particular claims.

Of especial significance is the fact that the rule of *American Pipe* was intended for the benefit of purported members of the class who sought to *intervene* in the action after class status was denied. The Court noted that a contrary rule "would deprive Rule 23 class actions of the efficiency and economy of litigation" Rule 23 was intended to promote, and would result in a multiplicity of motions by would-be intervenors. 414 U.S. at 553, 94 S.Ct. at 766. To suspend the statute in this case, however, would result in the maintenance of another suit by plaintiffs who took no action for almost five years after they were aware of information sufficient to put them on notice of possible fraud by the defendant.[11]

## III

■ Plaintiffs raise one other issue on this appeal: does Section 6 of the Exchange Act impose on a securities exchange a duty to enact rules for the protection of investors in member firms?

The district courts have been virtually uniform in holding that while Section 6 places a duty on an exchange to enforce its rules, there is no such duty to *enact* adequate rules. *See, e. g., Marbury Management, Inc. v. Alfred Kohn, Wood, Walker & Co.*, 373 F.Supp. 140, 143–144 (S.D.N.Y. 1974); *Weinberger v. New York Stock Exchange*, 403 F.Supp. 1020, 1033 (S.D.N.Y. 1975); *Carr v. New York Stock Exchange*, 414 F.Supp. 1292, 1299 (N.D.Cal.1976). *See also Merrill Lynch, Pierce, Fenner & Smith*

*v. Ware*, 414 U.S. 117, 130, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973).

We need not decide the question on this limited basis, however, for we have recently held that Section 6 was intended to protect only public investors and that members of an exchange could not base a claim for relief upon a violation of Section 6. *Lank v. New York Stock Exchange*, 548 F.2d 61 (2d Cir. 1977). We believe the rule should be the same for the member firm as for those who own it or provide it with capital. As we observed in *Lank*, the interests of the public customer may often be in conflict with those of the member firm, and solicitude for the interests of the member firms in order to avoid possible liability later may well redound to the detriment of the public investors. Paramount in the scheme of the federal securities legislation is protection of the public investor. We should not hinder the achievement of that goal. Therefore, we hold today that those who invest in a member of a securities exchange, whether as limited partners, subordinated lenders or purchasers of other than its publicly traded securities, have no claim under Section 6 against the exchange for damages suffered as a result of the exchange's violation of that section. Of course, the right of the public investor to recover from an exchange under Section 6 continues unabated, and private investors, where appropriate, may seek recovery from an exchange for violations of other provisions of the securities laws or for common law torts such as fraud.

The decision of the District Court is affirmed with costs.

---

**11.** In the light of *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), decided six weeks before the decision of the District Court in this case, we have serious doubt whether, as drawn, the claims against the Stock Exchange could withstand a motion to dismiss for failure to state a claim. *Ernst & Ernst* held that a private cause of action for

damages under Section 10(b) and Rule 10b–5 will not lie in the absence of any allegation of " 'scienter'—intent to deceive, manipulate, or defraud." 425 U.S. at 193, 96 S.Ct. at 1381. It is difficult to detect such an allegation here. However, defendants have not raised this point, and, in view of our disposition of these claims, we need not decide it.