Henry E. BARTELS, Theodore Rosen, and Ugo Quazzo

v.

ALGONQUIN PROPERTIES, LTD., a Vermont Corporation, Trask and Waite Realtors, Inc., a Vermont Corporation, Robert N. Waite, W. Whitbread Gilligan, George E. Trask and Guy A. Thomas, III, Individually and in their capacities as officers, directors and/or shareholders.

Civ. A. No. 76–144.

United States District Court, D. Vermont.

March 23, 1979.

Duel & Holland by Philip H. Bartels, Greenwich, Conn., Dick, Hackel & Hull, Rutland, Vt., for plaintiffs.

Carroll, George, Hill & Anderson by Alan B. George, James P. Carroll, and Scott S. Smith, Rutland, Vt., for all defendants except George Trask.

Dworkin & Jerome by William T. Jerome, South Londonderry, Vt., for defendant George Trask.

## MEMORANDUM OF DECISION

HOLDEN, Chief Judge.

This case involves alleged violations of federal and state securities statutes arising out of the sale of limited partnership interests in a real estate venture. Plaintiffs Henry E. Bartels (Bartels), Theodore Rosen (Rosen) and Ugo Quazzo (Quazzo) bring this action against defendants Algonquin Properties, Ltd. (Algonquin), Trask and Waite Realtors, Inc. (Trask Realtors), Robert N. Waite (Waite), W. Whitbread Gilligan (Gilligan), George E. Trask (Trask) and Guy A. Thomas, III (Thomas).[1] The complaint invokes various provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934, however, principal reliance is founded on Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5. The complaint also alleges claims based on the Vermont common law of fraud, misrepresentation, breach of fiduciary duty, recission and restitution, under the court's pendent jurisdiction. The defendants have filed a counterclaim alleging breach of contract.

Jurisdiction of this court over the federal claims is invoked under 15 U.S.C. § 77v and 15 U.S.C. § 78aa. Jurisdiction over the state claims is predicated upon the doctrine of pendent jurisdiction.

Quazzo was not included as a party plaintiff when the complaint was filed. On March 15, 1978, the court granted the defendants' motion to join Quazzo as a plaintiff on the grounds that his absence could have precluded the awarding of complete relief to those parties already present and would have opened the possibility of later litigation. Federal Rule of Civil Procedure 19(a). The court subsequently denied the plaintiffs' motion for permission to appeal this order under 28 U.S.C. § 1292(b).

The claims charging misrepresentation and fraud under § 10(b) of the 1934 Act, as well as S.E.C. Rule 10b–5, are generated by the sale by defendants of limited partnership interests in an entity by the name of Dorset Equities. Dorset Equities was a limited partnership sought to be organized by the defendants under Vermont law for the purpose of acquiring a large tract of land in Dorset, Vermont.

In the second count the plaintiffs allege common law fraud; in their third and fourth claims the plaintiffs allege the tort of misrepresentation; in their fifth count they allege breach of fiduciary duty; in their sixth count they seek recission; and in their seventh count they seek restitution.

Defendant Trask filed a counterclaim against the plaintiffs at the time he filed his answer. The remaining defendants were represented collectively by separate counsel and they filed a counterclaim in July of 1978. On October 13, 1978, the court entered an order permitting this belated counterclaim to be asserted under Federal Rule of Civil Procedure 13(f). The counterclaims are alike and claim that the plaintiffs failed to provide capital to the partnership in accordance with their agreement to do so, which resulted in the failure of the partnership and the loss of anticipated fees and profits. All of the defendants were brokers, agents or general partners of Dorset Equities.

---

1. The complaint, when filed in June of 1976, also named the law firm of Langrock, Sperry, Parker & Stahl, and its four individual members, as defendants. In February of 1978, however, all the parties, save for defendant Trask, joined in a written stipulation seeking to dismiss the action against Langrock, Sperry, Parker & Stahl, collectively and individually. All the parties, except Trask, joined in a motion under Federal Rule of Civil Procedure 41 to dismiss the action against these defendants. The court on September 13, 1978, ordered the complaint against them dismissed with prejudice.

*Facts*

*The Bartels Investment*

The plaintiff Henry E. Bartels is a citizen of Connecticut and vice president for operations of Insilco Corporation, Meriden. Until 1971 his association with Vermont was limited to his ownership with Mrs. Bartels of a six acre parcel of land in the southern part of the state which they acquired in 1948 as a wedding gift. The property was unimproved and was used by the Bartels for outdoor camping in the summer months. With the notable increase in land values, late in 1971, Mr. Bartels became actively interested in making speculative capital investment in undeveloped plots of Vermont land for the purpose of realizing capital gains in such properties upon favorable resale after a six month holding period. Up to that time Bartels' investment experience consisted primarily in readily marketable securities in some two hundred companies. He had also invested in a limited partnership.

By way of a favorable recommendation from a Connecticut attorney, Harry Welch of New Haven, on March 22, 1971, Mrs. Bartels wrote the defendant Robert N. Waite of Trask & Waite Realtors, Inc., Londonderry, Vermont, stating the Bartels' interest in acquisition of at least 100 acres of land in Vermont as an investment. In the ensuing months of 1971 and 1972 extensive communications were conducted between the Bartels and Trask & Waite in an effort to meet the investment plans and objectives expressed by the Bartels to the realtor. None of the several proposals presented during this time reached the closing stage. The plaintiff Bartels' efforts to achieve his stated objectives clearly indicate that, although he was eager to acquire large land holdings in the area, he was a careful and discriminating investor who demonstrated considerable acumen in a field in which he had no prior experience. During the time of these negotiations one proposal submitted to Bartels included a joint venture involving a 2,400 acre tract of land in the towns of Orange, Plainfield and Groton, Vermont, at a purchase price of $216,000 in unit shares of $11,000. The proposal apparently never reached fruition, but it was thoroughly examined and considered by the plaintiff Bartels and his counsel in Connecticut.

Although none of the purchases proposed by Trask & Waite materialized, the lines of communication with Bartels remained open on the strength of good business relationship and feelings of mutual trust. Bartels was an eager and willing client; Waite was an enterprising and enthusiastic realtor.

During the period of these dealings southern Vermont communities experienced a dramatic land boom. In July 1972 Thomas P. Salmon, who resided in this area, became an active candidate of the Democratic party for the office of governor. His campaign centered on a platform to lower individual property taxes by capturing the economic effect of the land boom by way of the imposition of the Land Gains Tax. He also advocated the tax to save the environmental interests of the state by restricting land development.

In this political climate Algonquin Properties, Ltd., was formed in 1972 as a Vermont corporation to engage in land investment and management by way of limited partnership ventures. Its avowed purpose was to provide a high rate of return on tax sheltered investments of tracts of land with lucrative development possibilities in the northern New England states. Algonquin's principal executive officers and stockholders included the individual defendants Trask, Waite, Gilligan and Thomas. One of the ventures undertaken by Algonquin and its principal officers was Dorset Equities.

The Dorset project was sought to be organized under the Vermont Uniform Limited Partnership Act (11 V.S.A. §§ 1391 *et seq.*), with purpose of acquiring a large tract of land in Dorset, Vermont, by purchase of 1,000 shares of capital stock of the Swezey Lumber Company, Inc. The 3,500 acres of land, more or less, constituted the single remaining asset of the Swezey corporation after it had discontinued its lumbering operation.

On January 11, 1973, the defendant Waite, on behalf of Trask & Waite Realtors, wrote to Bartels to offer him the opportunity to invest in Dorset Equities as a limited partner:

George Trask and myself and two new partners have formed a new land-buying entity called Algonquin Properties, Ltd. The enclosed resume should give you a very good idea of how we plan to operate, and it should also give you an idea of how we have operated to date. The final count of contracts to date in the first six months of our operation totaled over 8500 acres with a contracted value of $2,065,-000.00.

I am also enclosing a printout on a Dorset tract for your personal consideration. This is one of the largest pieces of land available for sale in Southern Vermont, and this tract alone accounts for 12% of the land on the grand list in the town of Dorset. It is good land with a limited road frontage but a generally large tract with good exposure, good views and, of course, a supreme location right in Dorset Hollow.

As you can see from the printout, we are looking for $125,000.00 from the limited investors. Out of this sum, 85% is deductible in the first year. The non-deductible items are legal, survey and miscellaneous expenses. These items will, of course, increase the capital-gain base. The miscellaneous expense will be used as a cushion in case we have some immediate expenses in regard to road building, site planning, topo maps—whatever. At the end of the year, any of this money that is not committed will be immediately returned to the limited investors. As to the other expense items, they should be fairly obvious. The management fee to the broker is a deductible expense as long as we call it a manager's fee and not a commission. We are selling this in five 20%-units and are asking that our investors send the funds to us no later than January 31, 1973.

I submit this property to you because I feel that it is an extremely good investment and one that allows a person to invest in a tract of land without the usual romance that goes on in a real estate transaction. I think that you should seriously consider this program because where else in Vermont could you take 20% of 3500 acres off the market for $25,000.00 with the added kicker of knowing that 85% of the down payment is deductible in the first year.

I will give you a call early next week so that we might discuss this in detail.

As stated in the communication, the offer was accompanied by a statement describing the Dorset Equities proposal and the proposed disbursement of the limited partner contribution for the expenses of the first year and estimated expenses for the ensuing two years.[2] It appears that proposed operation during the later period would re-

2. Located in the township of Dorset, Vermont, we have under contract 3,500 + acres of woodland with the contract price of $600,000.00 or $171.00 per acre. The property is located four miles from the Village of Manchester, one-half mile from the Emerald Lake State Park, 23 miles from Rutland, 10 miles from Big Bromley ski area, and 18 miles from the Stratton Mountain ski area. The property rises in elevation from 1,400 feet to 3,600 feet including the summit of Netop Mountain. The land has miles of logging roads throughout the property with 750-foot frontage on Dorset Hollow road. The property contains 23 brooks and streams with the Mattawee running through the land. The northerly boundary being the Danby/Dorset town line runs 7,900 feet east-west; the north-south boundary lines running 10,400 feet across. The perimeter of the property is 6.8 miles around.

The program is set up as follows: Swezey Lumber Company, Inc. of Manchester, Vermont, is selling 1,000 shares of capital stock fully paid and non-assessable. The sole remaining asset of the corporation being the land in Dorset, Vermont. The securities shall be sold for $60,000.00 which amount shall be evidenced by a promissory note of the Buyer and secured by all the shares of capital stock of the company to be held in escrow by the Factory Point National Bank of Manchester Center pursuant to an escrow agreement. The note of repayment shall bear interest at 6% compounded annually in arrears, computed on a payout of 89 years, becoming due and payable 25 years from the date of closing. The broker's management fee is to be paid by the Buyer in the amount of $60,000.00 with the gross purchase price being reduced by that amount to $540,000.00. The first year's interest in the

quire additional contributions from the limited partners. The submission also included a description of Algonquin's organization and its corporate objectives and a statement

of the operating experience of Algonquin and its key personnel in the purchase and sale of large tracts of undeveloped land.[3] The emphasis of this writing is on the op-

amount of $32,400.00 is to be paid at closing. We estimate the pro-rata taxes at $2,000.00, legal fees of $6,000.00, survey fee of $10,000.00, Algonquin Property Management fee of $12,000.00 plus miscellaneous expenses of $2,000.00.

### FIRST YEAR

| | |
|---|---|
| Prepaid interest at 6% | $ 32,400.00 |
| Pro-rata real estate taxes | 2,000.00 |
| Estimated legal fees | 6,000.00 |
| Estimated survey fee | 10,000.00 |
| Management fee to broker | 60,000.00 |
| Algonquin Property fee (2%) | 12,000.00 |
| Miscellaneous expenses | 2,500.00 |
| | $124,900.00 |

### YEAR TWO

| | |
|---|---|
| Miscellaneous expenses | $ 2,500.00 |
| Real estate taxes | 7,500.00 |
| Amortization on loan | 182.29 |
| | 7,682.29 |

### YEAR THREE

| | |
|---|---|
| Real estate taxes | 8,000.00 |
| Interest on loan | 32,389.06 |
| Amortization on loan | 193.23 |
| Miscellaneous expenses | 2,500.00 |
| | $ 43,082.29 |

3. The following is an extract of the relevant portions of Exhibit 3:

### ALGONQUIN PROPERTIES, LTD.

A Vermont corporation, Algonquin Properties, Ltd. has been formed to engage in land investment and management by means of partnership operations. Algonquin's primary objective is to provide a high rate of return on tax shelter investment monies secured by desirable land. Algonquin's area of present real estate investment is Vermont, New Hampshire and Maine. It is anticipated that in the future other attractive land parcels will be considered when they fall in line with Algonquin's investment objectives.

Algonquin applies professional investment standards to real estate. Numerous parcels of land are regularly inspected by Algonquin's management. After evaluating each parcel against proven criteria, the land which best meets high investment standards is put under contract. In most cases, this is rural land which in time will become subject to increasing population and desirability pressures. These pressures will increase the value of the land,

thereby providing the basis for the profits of the partnerships.

Algonquin's partnerships are the investment vehicle for each parcel or group of parcels of land. These partnerships are established on the following basis: The corporation, or its officers working under contract to Algonquin, become the general partner in a specific venture. Investing individuals enter the partnership as limited partners and supply all of the capital for each partnership. The contract for the land purchase becomes the property of the partnership. Algonquin charges a fee equal to 2% of the total value of the transaction to cover its expenses.

All of Algonquin's contracts have the same basic features. They specify the purchase of the land on a very high leverage basis, receiving at the closing a warrantee deed (or its equivalent) in return for a long-term, direct reduction mortgage covering the balance of the purchase price. As many of these investment expenses as possible will be structured to be tax-deductible. The term of the mortgage will generally exceed ten years. The contracts also state that payments on the mortgage will be primarily interest during its term. Taxes, fees, expenses and other carrying costs will be the responsibility of the partnership. In some instances, because of income-producing buildings, there will be depreciation possibilities. In all cases, however, a partnership tax return will be prepared for each limited partner in each venture so that he may file it in conjunction with his own tax return.

Because of the selected quality of the land and the high leverage basis on which it is purchased, it is reasonable to anticipate that the limited partners will have their original investment returned to them within a relatively short period of time. In some cases, this "cash out" will be sooner than in others. When the original cash investment is returned, the limited partners will retain at all times their proportional interest in the remaining parcel of land. Thereafter, income will constitute profits to be distributed as follows: 20% of the gross profits of the partnership to the general partner, 80% of the gross profits to the limited partners prorated in accordance to their proportional share the total investment by all the limited partners. It is anticipated that the profits to the limited partners will be taxable as capital gains.

In addition to a high return potential, Algonquin's limited partnerships present some interesting features. Of prime importance is the fact that the liability of each of the limited partners is, both by partnership agreement and land purchase contract, limited to monies already paid in and no others. While the nature of high leverage situations such as these tend

portunity for substantial capital gains and the tax shelter advantages to be achieved by resort to Algonquin's expertise and methods of operation.

to have risks in proportion to the return, the risk itself is minimized because the investment is in high-quality land. The results of the land purchase contracts and the partnership agreements should, for the limited partners, effectively change tax shelter dollars into capital gains while producing a high rate of return on these pre-tax dollars.

## PARTNERSHIP EXPERIENCE

The following is a listing of partnership contracts with which the officers of Algonquin Properties Ltd. have had experience.

SEPTEMBER 1969—377 acres woodland Franklin, New Hampshire. Purchase price $26,500.00, adjusted cost base $27,820.72. Cash down payment $2,500.00, balance secured by a purchase money first mortgage bearing interest at 7% for 10 years with two equal amortization payments of $12,000.00 each, payable five and ten years from closing, respectively. Sold May 1971—$48,000.00 all cash, mortgage discharged.

NOVEMBER 1969—360 acres operating dairy and grain farm Castleton, Vermont. Purchase price $90,000.00, adjusted cost base $92,400.00. Cash down payment $13,500.00, balance secured by a purchase money first mortgage computed on a payout over fifty years, bearing interest at 7%, becoming due and payable eighteen years from date of closing. 1972 fair market value: $157,500.00.

JULY 1979—417 acres woodland Enosburg, Vermont. Purchase price $55,000.00, adjusted cost base $57,500.00. Cash down payment $5,500.00, balance secured by a purchase money first mortgage computed on a payout over seventy-five years, bearing interest at 6½%, becoming due and payable fifteen years from date of closing. 1972 fair market value $73,000.00.

OCTOBER 1971—701 acres woodland Dorset/Manchester, Vermont. Purchase price $189,000.00, adjusted cost base $181,000.00. No cash down payment, property secured by a purchase money first mortgage computed on a payout over 89 years bearing interest at 6%, becoming due and payable eighteen years from date of closing. 1972 fair market value: $230,000.00.

SEPTEMBER 1971—216 acres abandoned farm Montgomery, Vermont. Purchase price $108,000.00, adjusted cost base $109,000.00. Cash down payment $8,000.00, balance secured by a purchase money first mortgage computed on a payout over fifty years bearing interest at 7½%, becoming due and payable thirteen years from date of closing. 1972 fair market value: $125,000.00.

SEPTEMBER 1972—1,114 operating dairy farm Weybridge, Vermont. Purchase price

The submission concludes with a statement of *Trends in Real Estate Values* which relates the profit potential of Algonquin's investments to recent growth trends

$475,000.00, adjusted cost basis $411,200.00. Cash down payment $30,000.00. Cattle and equipment sold for $63,800.00. First year's interest prepaid in advance, balance secured by a purchase money first mortgage bearing interest only at 6% for seven years, with the balance becoming due and payable seven years from date of closing. Property contains seven miles of road frontage, three houses, five barns, three miles of river frontage. Houses appraised at $105,000.00.

SEPTEMBER 1972—1,035 acres operating dairy farm Vergennes, Vermont. Purchase price $375,000.00. No cash down payment. First year's interest ($22,750.00) prepaid in advance, balance secured by a purchase money second mortgage, the first mortgage being held by the Federal Land Bank and Farm Credit Association. The second mortgage is a direct reduction loan bearing interest at 6½% computed on a payout of 89 years becoming due and payable twenty years from date of closing. The payments on the first mortgage are the obligation of the Seller who holds the second mortgage. Property contains four miles of town road frontage, four houses, three barns, ½ mile frontage on U.S. Route 7 and city water on most of the land. Houses appraised at $102,000.00.

SEPTEMBER 1972—2,000 acres woodland, Bloomfield, Vermont. Purchase price $400,000.00 no cash down payment, balance secured by a purchase money first mortgage bearing interest at 6% computed on a direct reduction loan over a period of 89 years, becoming due and payable in ten years from date of closing. Broker's management fee of 10% paid by Buyer at closing reducing gross mortgage price from $500,000.00 to $360,000.00. Property contains three camps, one farmhouse, a barn and a 2,500-foot paved airfield; house and barn appraised at $60,000.00. There is three miles of road frontage on both sides of Vermont 103 and about four miles of frontage on both sides of town roads through the property. There is about 1½ miles frontage on the Connecticut River. There is also about 2 miles of private roads to the camps.

SEPTEMBER 1972—250 acres woodland, Washington, Vermont. Purchase price $68,750.00, no cash down payment, balance secured by a purchase money first mortgage bearing interest at 6½% compounded annually, computed on a direct reduction loan over a period of 89 years, becoming due and payable on the 10th anniversary from the date of closing. Broker's management fee of $6,875.00 paid by Buyer at closing reducing the gross purchase price by that amount to $61,875.00. The first year's interest of $4,021.88 prepaid at

in New England real estate. The trends are expressed in optimistic quotations from representative members of Real Net, an association of leading Vermont relators.

The letter from the defendant Waite and the prospectus which accompanied it were persuasive; the plaintiff Bartels immediately called the defendant Waite to inform him that he wanted to participate in the Dorset Equities. This was followed on January 25, 1973, by Bartels mailing his check for $1,700 for a one-fifth interest as a limited partner in the venture. Bartels was an eager speculator and the defendant's representations indicated to him, at least, that Dorset Equities met his criteria of an opportunity to achieve a profit in a relatively short period of time, but consistent with the long term capital gains tax.

In making this investment Bartels fully understood that all of the capital in Dorset Equities would be provided by the limited partners and that the venture would be managed entirely by the general partners who would be compensated by a management fee of $60,000, payable over a three-year period. Bartels further understood that additional contributions might be called upon to meet mortgage payments, property taxes, interest and other current operating expenses.

Immediately following his inauguration as Governor of Vermont, Governor Salmon, in keeping with his campaign promises, sponsored the introduction of a bill in the General Assembly, the so-called Land Gains Tax. The purpose of the proposed legislation was to limit the property tax burden on basic housing to 5% of the householder's income and to supply the anticipated revenue shortage by capital gains on sale of lands held for periods less than six years. After severe and hotly contested legislative encounters, the Act was finally passed on the eve of adjournment over the strenuous and continuing opposition of the Vermont real estate community.

Shortly thereafter the defendant Gilligan, in behalf of the defendant Algonquin, informed the plaintiff Bartels of the enactment by letter dated April 27, 1973:

During the month of April, the Vermont legislature passed and the Governor signed into law a tax on the profits made from the sale of land. While not applicable to improved one-acre or small sales, it applies, on a sliding scale, to all gains made from the sale of real estate held for less than six years.

The management of Algonquin is in the process of evaluating this law in relationship to all of our partnerships. The immediate effect will be to reduce the number of sellers and, thereby, reduce the amount of land available for sale. By reducing the supply, the value of the land should increase proportionately. This will be in addition to the normal growth of land values. At the present time, we plan to hold sales, awaiting the development of this price trend.

The law is already being tested in the courts. We will watch developments along these lines and modify our position with relationship to each parcel as any legal trends develop.

If you would like any specific answers on this law or have any comments to pass on, please do not hesitate to contact us.

---

closing. The property is mostly wooded with some open cleared land. The land is located 14 miles from downtown Montpelier, 11 miles from downtown Barre, and 10.5 miles from Interstate I-89. Property has three miles of town roads intersecting the land with a four-corner intersection on the land. The land has a brook as its north border, with some elevations showing good views.

OCTOBER 1972—818 acres woodland, Corinth, Vermont. Purchase price $184,050.00, no cash down payment, balance secured by a purchase money first mortgage bearing interest at 6½% annually, computed on a direct reduc- tion loan over a period of 89 years, becoming due and payable in full on the 15th anniversary from the date of closing. Broker's management fee of $18,405.00 paid by Buyer at closing reducing the gross purchase price by that amount to $165,645.00. The first year's interest prepaid at closing in the amount of $10,-766.93. The property contains six miles of town road frontage, with several brooks running throughout the property. There are many usable private roads through the land. The land has several high elevations with beautiful views from open fields.

Accordingly to Bartels' testimony, this communication was the first he had heard of the Vermont Land Gains Tax. He was not troubled by the information and apparently made no effort to assess the impact the new tax might exert on the real estate market, in general, and his investment in Dorset Equities, in particular. The court is persuaded by the evidence presented that even if the defendants had accurately undertaken to forecast in January that the 1973 General Assembly would adopt the Salmon tax reform proposal, such a prediction would not have deterred the plaintiff Bartels' interest in Dorset Equities, nor would it have dampened his enthusiasm to speculate in the Vermont land development boom.

In the interim four-fifths of the capital in Dorset Equities had been paid to Algonquin. On February 23, 1973, Algonquin paid $32,400 from Dorset Equities funds to Ruth Swezey and Christopher Swezey, Jr., under an agreement, dated December 2, 1972, between the Swezeys and the defendant Guy Thomas, III, for the purchase of 850 shares of the capital stock of the Swezey Lumber Company for the total amount of $540,000. The Swezey stock was placed in escrow with the First Vermont Bank under an agreement between the buyer and seller at the time of the sale.

On the same day an agreement of Limited Partnership, to establish Dorset Equities as a legal entity, was signed by George Trask, Robert Waite, Guy A. Thomas and W. Whitbread Gilligan, as general partners, and by George Trask and Mary Ann Gilligan, wife of W. Whitbread Gilligan, as limited partners. In the purchase of the Swezey stock and the formation of the limited partnership, the defendants were represented by the law firm of Langrock and Sperry, Middlebury, Vermont; the Swezeys were represented by Attorney William Stockhousen of Manchester, Vermont. The prospective limited partners were not present and did not participate in the signing of the agreement of Limited Partnership. The formative steps taken on February 27th were consistent with the plan proposed to the investors. As far as the general partners were concerned, there was substantial compliance with 11 V.S.A. § 1392 (Vermont Uniform Limited Partnership Act of 1941).

The enactment of the Land Gains Tax had an adverse effect on the sale of underdeveloped tracts of land in Vermont during the last half of 1973, which continued through 1976. The tax factor, coupled with a general economic recession during the same period, retarded land development in Vermont and, in effect, undermined the land boom that was forecast to continue in the documents submitted to prospective investors in Dorset Equities in January 1973. These factors impaired the marketability of the fifth limited partnership share.

In September the general partners retrenched from the over-optimistic view which they advanced in an effort to market the proposed limited partnership shares in Dorset Equities. This appears from a letter by the defendant Trask to the plaintiff Bartels quoted in the margin.[4] The hopes

4. Dear Mr. Bartels:

This letter is long overdue and although I don't have any real specific news to report, I thought I'd better get it off anyway. At the present time the partnership has not been fully formed. There is one 20% limited share still available and for that reason we have not gone beyond the basic legal moves necessary to protect the interests of those involved with us. We have been actively delaying the completion of the partnership pending the consummation of internal changes at Algonquin involved with the three of us buying the stock of Guy Thomas. It appears that this transaction is essentially complete at this time and shortly we will be trying to sign up the last partner. We would be happy to consider anyone you may have to suggest.

My personal appraisal of the situation is "Bullish". High interest and general economic uncertainty have hurt real estate to some degree, but this is more than balanced by the fact that real estate is still the best hedge against inflation in the opinion of a great many people. This is to say that prices are still rising and we have seen no downward trend, nor do I expect one. We have a problem with the capital gains tax that was imposed by the last legislature, however I think that we have ample room to maneuver around it for the crucial first few years. Personally, I don't think the tax will survive either the courts or the next legislature.

and prediction made in this communication were unfounded. The tax survived the Vermont legislature. The enactment was subsequently sustained against constitutional challenge in the Supreme Court of Vermont. *Andrews v. Lathrop*, 132 Vt. 256, 315 A.2d 860 (February 5, 1974). The decision of the general partners to undertake to sell the entire property was not productive.

Despite the unfavorable climate then prevailing, the plaintiff Bartels responded to the management call for further capital by making an additional capital contribution of $6,000 on April 7, 1974.[5] This investment concluded the plaintiff Bartels' financial participation in Dorset Equities.

### The Rosen-Quazzo Investment

The plaintiff Theodore Rosen attended Albany and Columbia Law Schools, but has long been engaged in security investments as a registered representative for Lehman Brothers, and later with other brokers. He currently is employed as an investment representative by Morgan Stanley Corporation. He owned a second home in Vermont from 1963 to 1977. During this time he became a partner of the plaintiff Ugo Quazzo in the purchase of fifty acres of undeveloped land in Weston, Vermont, which was later exchanged for other undeveloped property in Londonderry, Vermont. Rosen subsequently marketed his interest in the Londonderry acreage.

The plaintiff Rosen has invested in limited partnership undertakings in California, Colorado and Connecticut. In making these investments he made no independent investigation of the relevant state laws; he relied on brokers and lawyers to supply such information. The plaintiffs Rosen and Quazzo, with a third partner, also invested in the construction of small condominium developments which they sold in 1970.

Mr. Rosen's interest with the Vermont real estate market drew his attention to Dorset Equities. It appeared to him to be a highly attractive opportunity for capital gain. He visited the site and discussed the prospect with his associate Quazzo and with the defendant Trask in person and by telephone from New York to Londonderry. On February 26, 1973, Quazzo advanced the funds for Rosen to purchase a limited partnership in Dorset Equities, with the understanding that Rosen would repay Quazzo for one-half the purchase cost as his share.

The plaintiff Ugo Quazzo was born and educated in Italy at the University of Turin. He is president of his own import-export business in New York City. The plaintiff Rosen has served as Quazzo's broker and investment counsellor. Quazzo acquired a vacation home in Vermont in 1961, which he owned jointly with his wife until

It isn't working very well and is hurting the wrong people.

Because of the capital gains tax problem we have decided to offer a wholesale sale of the whole partnership to a couple of logical buyers. The price, if accepted, would provide a handsome profit for the limited partners as well as Algonquin. The price offered is considered fair and at least one of the buyers has expressed a strong interest. I hope this works and I will be in touch if anything develops along these lines.

If you have any questions don't hesitate to give us a call or stop in.

Sincerely,

/s/ George E. Trask

5. Dear Mr. Bartels,

We had, perhaps overly optimistically, hoped to make our expenses out of sales this past year, but for a number of reasons this was not possible. It is necessary, in order to continue operating effectively, to make the projected call on capital of $6,000.00. We are still shy 20% on this deal, however, we are nonetheless circulating the partnership agreements which seems to take a very long time as it makes the rounds through lawyers and accountants. Hopefully we will find a fifth partner so that we can complete the partnership. The outlook seems to be brightening for land sales in spite of the economic uncertainties extant in the country. I think that inflation is starting to have its inexorable effect on holdings such as this. Most people tend to overlook inflation in times of other crises, but we see increasing land prices somewhat ahead of actual cost of living increases.

The tax returns are virtually complete and our accountants have promised that they will be sent out during this coming week, so they should be in your hands shortly.

If you have any questions, please don't hesitate to contact Bob Waite or myself.

Sincerely,

/s/ George E. Trask

recently when his interest in the property was transferred to Mrs. Quazzo.

Quazzo became interested in Dorset Equities through the plaintiff Rosen. The defendant Trask had been recommended to Quazzo as a competent realtor by Rosen. After Quazzo met with Rosen and Trask, he too concluded the project was an attractive prospect for early capital gain.

Although both Quazzo and Rosen were knowledgeable in speculative land investments, they were uniformed about the proposed legislation to impose a capital gains tax on short term land sales. However, information concerning the proposed legislation was widely publicized and circulated in the news media at the time of the Rosen-Quazzo purchase.

The plaintiffs also were uninformed concerning the specific provisions of Act 250 (1969, No. 250 (Adj.Sess.) eff. April 4, 1970), 10 V.S.A. §§ 6001 *et seq.* This enactment provides for creation of a state environmental board and divides the State of Vermont into nine administrative districts to regulate the use of lands and establish comprehensive restrictions for the development of lands comprising more than 10 acres. Act 250 is widely known by that designation. Rosen's and Quazzo's involvement in Vermont real estate transactions since 1970 afforded them ample opportunity to know and understand that this comprehensive environmental legislation had a direct bearing on the development of large tracts of lands. Although they may not have been aware of the specific provisions of the Act and its application to Dorset Equities, they had knowledge of the Act.

The plaintiffs Rosen and Quazzo conversations about Dorset Equities were limited to the defendant Trask; no other officer or general partner was involved. At the time of the trial neither Rosen nor Quazzo had any recollection of reading the Dorset prospectus composed of plaintiffs' exhibits 1, 2 and 3. Their investment in the limited partnership was not induced nor caused by these documents.

The plaintiff Rosen learned of the Land Gains Tax after its enactment. He asked George Trask what it would mean to his and Quazzo's investment. Trask informed him that if the Dorset property was held for a long term, the investment would be all right in terms of the tax; if held for a short term, the tax would be harmful.

Both plaintiffs Quazzo and Rosen visited and viewed the Dorset Equities property with the defendant Trask. They were impressed with the property as a development site and as a short term land investment with good potential for early and lucrative profit. Neither Rosen nor Quazzo were deceived by any representation made by the defendant Trask nor any other of the defendants. Neither Rosen nor Quazzo would have been deterred from their investment had they known and forecast the enactment of the Land Gains Tax. Although these plaintiffs were not aware that Act 250 proscribed any development of land at elevations above 2,500 feet, they offered no testimony that this restriction would have influenced their decision to invest in Dorset Equities.

In February 1974 the defendant Trask informed the limited partners that in order for the partnership to continue to operate effectively, it was necessary to make the projected call on them for an additional capital contribution of $6,000. They were also notified that one limited partnership share, representing 20% of the proposed capital investment contemplated at the time of organization, had not been marketed. As indicated above, Bartels complied with the request. Rosen and Quazzo did not meet the request for the reason they thought they had lost what they had previously invested. They refused to invest further.

### The Demise of Dorset Equities

After the partnership was organized the managing partners caused an engineering survey of the property to be completed. As a result of the survey, it was ascertained that the Swezey tract contained 2,840 acres, rather than 3,500 acres represented to Algonquin at the time of the contract for

purchase of the Swezey stock. By reason of the shortfall, the total purchase price of the stock was reduced on a pro rata basis of $200 per acre.

At the time of purchase the defendant Trask was of the opinion that approximately 40% of the total acreage was above the elevation of 2,500 feet. The survey established that 1,680 acres in the tract, or 59% of the land, was above the elevation of 2,500 feet; 1,160 acres or 41% of the 2,840 acres were below the critical elevation and available for development under Act 250.

The defendant Trask informed the Dorset Equities partners, by letter dated August 26, 1974, of the fact that the survey had been made at a cost of $8,500 and revealed a shortage of 660 acres. He explained the loss to the partnership at $60 per acre was offset by the reduction in the purchase price by $200 per acre for a total of $132,-000. The communication goes on to state that the real estate market in southern Vermont was very poor in the first six months of 1974, but had shown marked improvement since July 4th. He advised the limited partners to "Hang in there." The communication makes no disclosure of the fact that the survey established that 1,680 acres of the proposed development were above the critical 2,500 elevation line which precluded its development for residential use by force of Act 250.

The shortage in the acreage generated a controversy between the managing partners and the Town of Dorset. Although the lands surveyed were assessed on the town grand list at 3,500 acres, the management took the position that the real estate tax on the property should be assessed on the basis of 2,840 acres. The taxes assessed against the property became delinquent for the years 1973 and 1974. The Town of Dorset commenced litigation to collect the taxes and foreclose its statutory tax lien. While the action was pending the defendant Trask tendered the amount due on August 9, 1974. The attorney for the town refused to accept payment without the additional payment of his collection fee of $800. The attorney's fee was eventually disallowed by the Superior Court, Bennington County. The town recovered judgment for taxes and interest in the amount of $4,940.21.

The Swezey tract eventually was subjected to a tax sale. Rosen testified that he would have appreciated the opportunity to bid on the property with Quazzo. The property was bid in by Christopher Swezey, Jr. The delinquent taxes for the years 1973–1976, assessed to the Swezey Lumber Company, were paid by Swezey May 22, 1976.

Prior to the organization of Dorset Equities, the Swezey Lumber Company on October 11, 1968, granted an option of first refusal to Frederick W. Tetzlaff of Wyncote, Pennsylvania. The option expired by its terms October 10, 1978. There is nothing in the record to indicate the option was ever exercised, nor that there was any occasion to afford the optionee an opportunity to purchase any portion of the tract. The defendants were reliably informed that the Tetzlaff option would not be exercised.

The plaintiffs were not aware of the tax delinquency as it developed, nor were they informed concerning the Tetzlaff option. The plaintiffs, however, knew by the end of 1974 that Dorset Equities had no funds to pay the taxes assessed on the Dorset property.

In September 1973 the managing partners informed the plaintiff Bartels that due to capital gains tax problems, they had decided to offer for sale the entire partnership proper. It was also pointed out that one 20% limited partnership share was still available. The efforts of the defendants to sell the Swezey property as a unit were of no avail. Similarly, efforts by Trask to sell the merchantable timber on the property did not succeed.

During the winter of 1974–75 the managing partners sought to arrange a meeting of all the partners. George Trask wrote the plaintiff Bartels on January 27, 1975:

Our next mortgage payment is coming up for the Dorset property pretty soon and with it the need for money, but before getting into that, there are several aspects to this deal that could best be ex-

amined in a face to face meeting of the limited partners and myself. Would you be able to meet with us in South Londonderry on the 8th of February at 9:00 in the A.M.?

If you would be able (sic) to make such a meeting, perhaps you could suggest an alternative time. I am trying to ascertain if this would be a good time for the others involved and would appreciate hearing from you as soon as possible.

Mr. Bartels' response was:

. . . cannot be in Vermont on Feb. 8. I don't know when I will be in Vermont next. Suggest you put the subject matter in writing. You should also prepare a statement of income and expense for 1974.

On February 8, 1974, the defendant Trask met with the plaintiffs Rosen and Quazzo. Bartels did not attend. Mary and Bob Sullivan, who represented the remaining limited partnership interests, were also present. Trask testified the main purpose of the meeting was to obtain the signatures of the limited partners to the amended partnership agreement and to obtain additional capital if possible. None of the limited partners were willing to sign the proposed agreement and no additional funds were obtained.

The affairs of Dorset Equities continued in a downward course. Without additional capital the partnership could not and did not survive. This was recognized in a letter from Algonquin to the plaintiff Bartels, signed by the defendant Trask.

It appears that at this time, Dorset Equities, for all intents and purposes is, finished as an operating entity as we have been unable to meet our commitments, and foreclosure is immenent (sic). I want to avoid that procedure as we have no basis for asking for any delay and the process can be costly and unpleasant. I have been unsuccessful in convincing any of the partners to continue the support of the partnership, and without that support we can't continue to operate.

I have been approached by a potential buyer of the property, and he has spent considerable time exploring the property. At this point he has submitted a proposal that is basically for an option for 60 days to buy the stock of the Onion Lumber Co. from Dorset Equities for $10,000, which would be available for distribution to the existing partners. I am in favor of accepting this proposal on the theory that $10,000 is better than nothing, which is what we will end up with if we are forced to foreclose. There are a number of details that would have to be worked out, but I am reasonably confident that they can be worked out.

If you think I shouldn't try to put this deal together, please let me know by December 20, with any ideas for a different approach.

Sometime thereafter Dorset Equities became in default on the payments of the purchase price under the escrow agreement. Further efforts were made to find a market for the timber. A timber cruise of the Dorset property, conducted by the Green Diamond Forestry Service, Inc., in 1975, indicated the total value of the harvestable timber at $196,000. However, any prospect for selling the timber was precluded because Dorset Equities was in default on the mortgage. The general partners concluded that the mortgagees would not permit the sale of the timber while the mortgage was in default.

The general state of the economy, the depressed real estate market in Vermont, and the inability of the managing partners to attract additional capital from the limited partners or from other sources were factors which contributed to the collapse of the Dorset Equities project.

*Fraudulent Conduct*

The court finds that at the time the Dorset Equities promotion was conceived, each and all of the defendants were convinced that the acquisition of the Dorset tract by purchase of the outstanding stock in the Swezey Lumber Company presented an opportunity for substantial investment profit. The defendants' enthusiasm in this respect was not dampened in the slightest by the

Salmon campaign for election to the office of governor of Vermont during the fall of 1972 and his advocacy of the Land Gains Tax. Although there was extensive publicity concerning the proposal, the possibility of such an enactment did not produce any serious impact on the increasing opportunities for land sales and development which peaked in 1972. The proposed legislation had a stimulating effect during February and March 1973 as some investors sought to market their properties in the event the proposed enactment should achieve passage.

The Dorset Equities' proposal, described above in text and in footnotes 2 & 3 (Plaintiffs' Exhibits 1, 2 and 3), was prepared and approved of by all of the promoters as general partners in an atmosphere of the 1972 Vermont land boom. The Swezey property was attractive as an investment for various reasons. It could be acquired on highly favorable terms with reasonable interest rates. It is in a prime location with several ski areas within short traveling distance. The property was accessible and offered attraction for development for recreational residences. The property also had substantial quantities of marketable timber. The defendants' enthusiasm for the investment is implicit in the submission that was made to the plaintiff Bartels, by way of Exhibits 1, 2 and 3.

The defendants, one and all, were aware that a substantial portion of the tract could not be developed for residential sites by reason of the restriction imposed by Act 250 on development above 2,500 feet. The defendant Trask was of the opinion that 40% of the tract was subject to this restriction. After the engineer's survey was completed, it was determined that 1,680 acres were above the 2,500 feet elevation, constituting 59% of the total tract. This fact was not disclosed to Bartels.

The property was represented by the Swezey interests as containing 3,500 acres, more or less. Trask was of the opinion that the estimate was excessive. There was no caveat to this effect in the submission to the plaintiff Bartels. The true acreage was not disclosed until August 26, 1974. In that communication Trask indicated he had suspected the shortage for some time.

In their eagerness to promote the sales of the limited partnership interest, the defendants submitted the general experience of the general partners in extensive land development projects. (Plaintiffs' Ex. 3.) In this submission the defendants held themselves out as experts in real estate investment of the type offered to the plaintiff Bartels. Of the ten experiences listed, four were personal investments of the defendant Thomas, individually, or with members of his family.

One parcel of 701 acres in the Dorset-Manchester area was a limited partnership property and represented to be a highly favorable investment secured by a purchase money mortgage with no cash payment. The property was subsequently foreclosed because the partnership failed to fund the mortgage payments. The 114 acre dairy farm met a similar fate by foreclosure when the necessary funding by the partners was not made. The two thousand acres of woodland in Bloomfield, Vermont, reverted back to the owners after severe problems with the land titles developed. While the final results of these ventures were not known at the time of the Bartels investment, the projects were represented as having great potential for capital gain.

The representations were overstated, misleading and not founded on the true facts. While the court is not persuaded that the representations made in the prospectus submitted to the plaintiff Bartels were made with any evil intent to defraud, the submission was recklessly made by overstating the successful experience of the managing partners. The statements were entirely unwarranted and deceptive. The promptness with which the plaintiff Bartels reacted to the contents of the Dorset prospectus is persuasive that he relied on the representations contained in plaintiffs' exhibits 1, 2 and 3. As a result of the acts and conduct on the part of the defendants, the plaintiff Bartels has sustained the loss of his investment in the amount of $23,000 and consequent loss of yield at 6% per annum in the

amount of $8,821.88, for a total damage of $31,821.88.

The claims of the plaintiffs Rosen and Quazzo stand differently. Both Rosen and Quazzo testified at the trial. Neither of these plaintiffs had any recollection of having seen the Dorset Equities prospectus that influenced the sale to their co-plaintiff Bartels. Although both Rosen and Quazzo relied on the defendant Trask's judgment in making the investment as limited partners in Dorset Equities, neither witness presented any evidence that Trask made any false or misleading statement which induced them to invest in the joint venture. While the defendants, as general partners, were under a duty to disclose the results of the land survey of the property, completed in August 1974, to the effect that nearly 60% of the Swezey tract was not subject to development by reason of restrictions imposed by Act 250, at that time both Rosen and Quazzo were convinced that their original investments were lost and had previously decided to make no further investments in the partnership.

### Conclusions

By the provisions of Section 10 of the Securities Act of 1934, it is

unlawful for any person . . . (b) (t)o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

In 1942 the Securities and Exchange Commission promulgated Rule 10b–5, which provides:

*Employment of manipulative and deceptive devices.*

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud.

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

The first question for decision is whether the limited partnership shares proposed for sale by the defendants to the plaintiffs constitute securities within the meaning of the Act. The limited partnership shares in Dorset Equities meet the formula stated in *Securities and Exchange Commission v. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946):

. . . [a] scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

*Id.* at 298–299, 66 S.Ct. at 1103.

The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.

*Id.* at 301, 66 S.Ct. at 1104.

Judge Medina has reminded us that the scope of "investors" has been slowly expanded through judicial construction to include limited partners. *Lank v. New York Stock Exchange,* 548 F.2d 61, 65 (1977). *See also Kroungold v. Triester,* 407 F.Supp. 414, 417 (E.D.Pa.1975); *New York Stock Exchange v. Sloan,* 394 F.Supp. 1303 (S.D. N.Y.1975).

The court holds that the limited partners' shares constitute investments within the provisions of Section 10(b) of the Act of 1934 and Rule 10b–5.

In *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976) the Supreme Court resolved—"the question whether a private cause of action for damages will lie under § 10(b) and Rule 10b–5 in the absence of any allegation of 'scienter'—intent to deceive, manipulate, or defraud." The answer was given in the negative. The Court took the pains to point out in the margin: "We need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b–5."

The court of appeals in this circuit was confronted with that very question in *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38 (2 Cir.), *cert. denied* —— U.S. —— (1979), 99 S.Ct. 642, 58 L.Ed.2d 698. The court held that where the offending wrongdoer owes a fiduciary duty to the injured investor—reckless disregard of truth or falsity supplies the essential ingredient of scienter. *Id.* at 44.

■■ It is clear from the facts presented at the trial that the defendants, as general and managing partners, occupied a position of trust as to those they sought to attract to the venture as limited partners. The plaintiffs imposed substantial confidence in the defendants Trask and Waite. Through them the obligation of trust attached to all the general partners. *See Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545 (1928) (Cardozo, C. J.).

■ From the position of trust occupied by the defendants, as the promoters and prospective managing partners of Dorset Equities, the context of the prospectus presented in plaintiffs' exhibits 1, 2 and 3, was materially and recklessly misleading concerning facts which the defendant knew, but were unknown to the plaintiff Bartels. All of the defendants are liable for the consequences to the injured investor. *Rolf v. Blyth, supra,* 570 F.2d at 46, 48. *See also Securities and Exchange Commission v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 848 (2d Cir.) (Waterman, J.), *cert. denied* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), *rehearing denied* 404 U.S. 1064, 92 S.Ct. 733, 30 L.Ed.2d 753 (1972).

■ The plaintiffs Rosen and Quazzo have failed to establish that the defendants recklessly made any untrue statement of a material fact or omitted to disclose any material facts which caused these plaintiffs to purchase the limited partnership share in Dorset Equities within the proscription of Section 10(b) of the Securities Act of 1934 and Rule 10b–5. *See Titan Group, Inc. v. Faggen,* 513 F.2d 234, 239 (2d Cir.) (Waterman, J.) *cert. denied* 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975).

*The Pendent State Claims for Fraud*

■ The court's findings of fact establishing liability to the plaintiff Bartels under Rule 10b–5 also furnish the ingredients of liability under common law principles of actionable fraud. *Fayette v. Ford Motor Credit Co.,* 129 Vt. 505, 282 A.2d 840 (1971); *Anderson v. Knapp et al.,* 126 Vt. 129, 225 A.2d 72 (1966); *Batchelder v. Birchard Motors, Inc.,* 120 Vt. 429, 144 A.2d 298 (1959).

By the same token, the absence of proof that the defendants or any of them made materially false representations to the plaintiffs Rosen and Quazzo rules out the questions of reliance and causation. As with their federal securities claims, the Rosen-Quazzo pendent state claims for fraud under the law of Vermont are not sustained.

*Application of the Statute of Limitations*

■ The defendants have raised as an affirmative defense the statute of limitations. Section 10 of the 1934 Act contains no specific limitations period; the federal courts apply "those statutes of limitation of the forum state which best effectuate the policies underlying the federal statute." *Stull v. Bayard,* 561 F.2d 429, 431 (2d Cir. 1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 783 (1978). The Vermont Securities Act, 9 V.S.A. §§ 4201–4241, provides a period of limitations of two years. 9 V.S.A. § 4225. Common law actions for fraud in Vermont are governed by Vermont's general civil statute of limitations, 12 V.S.A. § 511, which imposes a six-year limitation.

In actions alleging violations of federal securities law the second circuit court of appeals has "consistently adopted state statutes of limitation for actions based upon common law fraud." *Stull, supra,* at 431 (citations omitted).[6] Under the New York statutes, actions for common law fraud must be brought within six years, while actions to recover on a liability created or imposed by statute, except as otherwise provided, must be brought within three years. *See Klein v. Bower,* 421 F.2d 338, 343 (2d Cir. 1970). Notwithstanding the existence of a shorter period for causes of action created by statute, this circuit has applied the six-year limitation to actions arising under Rule 10b–5. *Stull, supra,* at 431; *Phillips v. Levie et al.,* 593 F.2d 459, at 461, slip op. at 1351 (2d Cir. 1979).

In *Arneil v. Ramsey,* 550 F.2d 774 (2d Cir. 1977), the court dealt with a situation similar to the one presented here. Relying on the reasoning in *Douglass v. Glen E. Hinton Investments, Inc.,* 440 F.2d 912, 914–916 (9th Cir. 1971), the court of appeals held that Washington's three-year statute of limitations, for actions founded upon fraud, governs a Rule 10b–5 claim. *Arneil, supra,* at 780. In *Douglass* the ninth circuit court of appeals rejected the argument that Washington securities regulation provisions should supply the period of limitations for a Rule 10b–5 case.

A contrary result was reached in *Hudak v. Economic Research Analysts, Inc.,* 499 F.2d 996 (5th Cir. 1974), which held that the Florida Blue Sky law's period of limitations, rather than Florida's general fraud period, governs a Rule 10b–5 case arising in that state. Judge Goldberg explained that Florida's Blue Sky law tracks Rule 10b–5 almost exactly in wording and in the interpretation given by Florida's courts. Unlike Florida law, the Vermont securities law contains substantially different wording, reproduced in the footnote,[7] and the language has not been construed by the Vermont courts. Furthermore, the Vermont act bars recovery unless and until the plaintiff has offered to return the securities to the seller,

**6.** It should be noted, however, that the majority of these cases have turned on the special provisions of New York law. New York has no express statutory civil cause of action for securities fraud. A civil cause of action has been implied from § 352–c of the New York General Business Law, which makes it a misdemeanor to engage in fraud or misrepresentation when dealing in securities. *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,* 378 F.Supp. 112, 129–30 (S.D.N.Y.1974), *modified on other grounds,* 540 F.2d 27 (2d Cir. 1976); *Architectural League of New York v. Bartos,* 404 F.Supp. 304, 313 (S.D.N.Y.1975); *Gross v. Diversified Mortgage Investors, et al.,* 431 F.Supp. 1080, 1094, (S.D.N.Y.1977).

**7.** § 4224. Fraudulent practices
Whenever it shall appear to the commissioner, either upon complaint or otherwise, that in the sale of any securities within this state including any security exempted under the provisions of section 4203 of this title, any person, as defined in this chapter, shall have employed or employs or is about to employ any device, scheme or artifice to defraud or to obtain money or property by means of any false pretense, representation or promise, or that any such person shall have made, makes or attempts to make in this state fictitious or pretended purchases or sales of securities, or shall have engaged in or engages in or is about to engage in any practice or transaction or course of business relating to the purchase or sale of securities which is in violation of law or which is fraudulent, or which has operated or which would operate as a fraud upon the purchaser, any one or all of which devices, schemes, artifices, fictitious or pretended purchases or sales of securities, practices, transactions and courses of business are hereby declared to be and are hereinafter referred to as fraudulent practices; or that any person is acting as dealer or salesman within this state without being duly registered as such dealer or salesman as provided in this chapter, the commissioner may investigate, and whenever he shall believe from evidence satisfactory to him that any such person has engaged in, or is about to engage in any such fraudulent practices, or is selling or offering for sale any securities in violation of this chapter or is acting as a dealer or salesman without being duly registered as provided in this chapter, the commissioner, in addition to any other remedies, may bring action in the name and on behalf of the state against such person and any other person or persons theretofore concerned in or in any way participating in or about to participate in such fraudulent practices or acting in violation of this chapter to enjoin such person and such other person or persons from continuing such fraudulent practices or engaging therein or doing any acts in furtherance thereof or in violation of this chapter.

and it provides a remedy only to purchasers, not sellers who have been defrauded. 9 V.S.A. §§ 4224, 4225. Neither restriction exists under Rule 10b–5 or under Vermont's common law doctrine of fraud. *See Fayette v. Ford Motor Credit Co.*, 129 Vt. 505, 282 A.2d 840 (1971).

█ Since the Vermont Securities Act is no more akin to Rule 10b–5 than Vermont's common law of fraud, the court finds no reason to depart from the settled rule of applying the statute of limitations for common law fraud. The complaint in the present action was filed on June 29, 1976. The alleged misrepresentations were communicated to the plaintiffs in early January of 1973. Under 12 V.S.A. § 511, the action is not time-barred.

█ It is noteworthy that the application of the state's two year statute of limitations, 9 V.S.A. § 4225, would not foreclose this action. "While state law fixes the length of the limitations period, federal law determines when the period begins to run." *Arneil v. Ramsey, supra*, 550 F.2d at 780. The federal rule is that "the statute commences to run when the plaintiff has actual knowledge of the alleged fraud or knowledge of facts which in the exercise of reasonable diligence should have led to actual knowledge." *Stull v. Bayard, supra*, 561 F.2d at 432. The date upon which the plaintiff Bartels had reason to believe his investment was in jeopardy was, at the earliest, in July of 1974, when Trask submitted "The Outlook for Real Estate Investment in Vermont from July 1, 1974," and when he informed the partners of the recent legislative developments, environmental and economic problems, but counseled to "Hang in there." Nothing in this letter, nor in any written or oral communication that preceded it, corrected or retracted any of the materially misleading statements found in plaintiffs' exhibits 1, 2 and 3. The court concludes the action is not barred by any applicable statute of limitations.

*The Defendants' Counterclaim*

█ In their counterclaim the defendants complain that the plaintiffs entered into an oral agreement to contribute additional capital to the partnership as the need arose. They claim that Rosen and Quazzo's refusal to contribute additional capital, in breach of their contractual duties, led to the collapse of the venture. They seek compensatory damages for the loss of anticipated profits and fees, as well as for damage to business reputation. The plaintiffs assert that this counterclaim is barred by the statute of frauds, 12 V.S.A. § 181, and that it is unsupported by the facts.

The court finds it unnecessary to reach the statute of frauds issue. The plaintiffs each testified that they did not enter into any oral agreement to contribute further capital. The defendant Trask testified the contribution of additional capital was not mandatory, but optional; that there was no requirement binding the plaintiffs to make future capital contributions after the first investment. There is no substantial evidence to the contrary. Furthermore, the proposed amended limited partnership agreement that the defendants persistently urged the plaintiffs to sign, to no avail, provided that additional calls on capital were not to be mandatory. It is highly unlikely that any contemporaneous oral agreement made at the time the written draft was proposed would have differed in this respect. In short, the defendants have not sustained their burden of proof as to the existence of any binding oral agreement to contribute further capital.

Based on the facts established by the evidence and the applicable law, the court directs the clerk to enter judgment for the plaintiff Henry E. Bartels to recover of the defendants Algonquin Properties, Ltd., Trask & Waite Realtors, Inc., Robert N. Waite, W. Whitbread Gilligan, George E. Trask and Guy A. Thomas, III, the total amount of $31,821.88 and his costs.

The complaints of the plaintiffs Theodore Rosen and Ugo Quazzo will be dismissed. The Clerk is further directed to enter dismissal of the defendants' counterclaims as to all plaintiffs. It is so ORDERED.